## In re Ricky Clay BALLARD, Debtor.

### Bankruptcy No. 96–11935.

United States Bankruptcy Court, M.D. Louisiana.

Aug. 25, 1999.

---

**614**

Charles W. White, Baton Rouge, LA, for debtor.

Dwayne M. Murray, Baton Rouge, LA, trustee.

Bennett Boyd Anderson, Lafayette, LA, Special Counsel for trustee.

### RULING

LOUIS M. PHILLIPS, Bankruptcy Judge.

Before the Court is a proposed compromise and settlement of a pre-petition cause of action for personal injuries suffered by the debtor, which requires that we answer the question whether the debtor, individually, should be entitled to share to the extent that the settlement amount is attributable to post-petition future medical expenses and, perhaps, post-petition lost earning capacity.

Trustee, attorney for trustee, and the injured debtor in this case seek approval of a pre-petition personal injury suit settlement agreement, with the trustee agreeing that the amount of the settlement is acceptable but urging that the estate is entitled to the whole of the settlement proceeds. The actual terms of the proposed settlement provide for the debtor to receive a portion of the proceeds. There is no dispute that the monetary amount is a good settlement and compromise (in light of the nature of the injuries suffered, the questions concerning attribution of fault, insurance coverage, etc.).

A dispute has arisen over the proposed carving up of the proceeds. The debtor proposes to compromise the lawsuit by bifurcating the recovery into a component representing future medical expenses, that is payable to the debtor, and a component payable to the estate (with the debtor and the estate sharing payment of attorney's fees).

At hearing, in response to questions from the Court evidencing a concern about the estate's lawyer having a conflict of interest (representing the estate but submitting a proposed settlement which allocates a portion of the money to the debtor), it was established that the tortfeasor's insurer proposed the allocation to obtain a consensual release from both the debtor and the estate, without prompting of any kind by the lawyer. The Court believes the lawyer and concludes that the proposal by the defendant(s) is representative of either practice or thinking (or both) within other states (or districts within this state). The trustee responds that the amount apportioned to the debtor for future medical expenses is estate property (pursuant to § 541(a)(1)),[1] is non-exempt, and should be paid over to the estate. The trustee, the trustee's lawyer, and the debtor place the matter before the Court seeking a directive to take back to the defendant insurer (effectively waiving any right to claim the necessity of proceeding by adversary proceeding to obtain declaratory judgment, etc.). Should this Court "split the baby"[2] and allow bifurcation of pre- and post-petition medical expenses to allocate a portion of the settlement proceeds to the debtor?

In this Ruling we set forth the reason for issuing this opinion for publication (af-

---

1. 11 U.S.C. § 541. Property of the estate
 The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
 Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
 * * * * * *
 11 U.S.C. § 541(a)(1) (West 1993).

2. *See,* H. Kent Aguillard, *Split the Baby? Personal Injury Causes of Action in Bankruptcy* 37 LA. B.J. 339 (Finding, we think, that such actions were property of the estate and calling for legislative reform to allow an exemption in future medical expenses and loss of future earning capacity).

ter numerous non-published rulings on this score reaching the same conclusion), decline the proposed bifurcation, and rule that the entire settlement amount is non-exempt estate property.[3]

## FACTS AND PROCEDURAL HISTORY

Debtor Ricky C. Ballard was injured in a two-vehicle collision on November 4, 1994. Mr. Ballard suffered numerous injuries, chief among them a severely fractured hip that required surgery in February of 1996. Mr. Ballard has a limp, is unable to run or jog, and is said to face a future total hip replacement. The debtor is said to have no identifiable post-petition wage loss, but alleges lost earning potential due to his disability.[4] Mr. Ballard and the driver of the other vehicle each asserted liability against the other. On October 15, 1996 Mr. Ballard filed this chapter 7 bankruptcy. Although Mr. Ballard's Statement of Intention lists suits by and against him stemming from the accident, his damage suit is neither itemized in Schedule "B," nor in any portion presently claimed as exempt in schedule "C."

Counsel who represented Mr. Ballard in the personal injury action before the bankruptcy case was filed was authorized, pursuant to § 327(e), to represent the estate in prosecuting the personal injury action (to the extent of the estate's interest). Given the liability question, as was explained at hearing on the settlement, he has done a good job in obtaining the proposed settlement amount. Counsel obtained, for the Court's consideration, a proposed settlement and compromise whereby the opposing party would pay $55,000, with $10,000 payable to Mr. Bal-

lard personally, for the purpose of paying (or representing the appropriate costs of) future medical bills (primarily a future hip replacement), and, perhaps, compensation for loss of future earning capacity. The remainder would be paid to the estate (the debtor's $10,000 is the payment proposed net of a proportionate share of legal fees and expense).[5]

By all accounts, Mr. Ballard has been a most cooperative party, contributing much time and assistance to the prosecution of the action and, as mentioned, apparently did not inject himself (personally or through counsel) into the litigation or settlement negotiations to seek a personal share of the proceeds. In other words, Mr. Ballard has clearly complied with his duty, contained in § 521(3)[6] of the Code, to cooperate with the trustee in estate administration.

If there is a case in which the debtor should, equitably, be able to lay claim to a portion of settlement proceeds, this is the case. Maybe that is why we feel compelled to issue this opinion—to publicize the situation of those in Mr. Ballard's position. His accident caused a long-term condition that generates a portion of the personal injury claim. He was in need of bankruptcy relief in the form of securing a discharge of the debt generated by the accident, but the cost of bankruptcy relief (which we find to be the same as the state law would provide outside of bankruptcy) is that his estate (his creditors) get the personal injury claim. Perhaps, because this Court cannot judicially legislate, this opinion is a call to the Louisiana Legislature to analyze this situation to determine whether, within the realm of legislative

---

**3.** Over this proceeding we have both original jurisdiction and authority to issue a final order. 28 U.S.C. § 1334(b); 157(a) and (b)(2)(A) (West 1993).

**4.** *Letter from Bennett Boyd Anderson, Attorney at Law* (May 29, 1998).

**5.** *Letter from Donald R. Smith, Attorney at Law* (December 18, 1997), and attachments.

**6.** § 521. Debtor's duties

The debtor shall—
 * * *

(3) if a trustee is serving in the case, cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title[.]

11 U.S.C. § 521(3) (West 1999).

will, there is a place for people like Mr. Ballard in an amendment to the exemption statutes—to exempt personal injury claims, a portion of personal injury claims, or something.

If there is another reason for this opinion, it is to focus the thinking of parties before this Court, so that: (i) either our conclusions will be brought before a reviewing court and reversed; or (ii) the questions raised here will, at least in this Court, be laid to rest by means of published opinion. Either way, the issue of a debtor's right to a portion of pre-bankruptcy settlement proceeds will be clarified, at least to those coming before this Court.

We think the need for clarification arises at least in part from a Fifth Circuit case, which can be read as providing uncertainty sufficient to allow courts in Louisiana, and perhaps the Fifth Circuit all over, who want to allocate to debtors a portion of settlements of pre-bankruptcy causes of action, to find a basis for doing so. We think that neither the Bankruptcy Code (is it property of the estate?) nor Louisiana state law (if it is property of the estate, is it exempt?) provides for such bifurcation. We offer the following opinion as to why.

## ANALYSIS

### FIFTH CIRCUIT JURISPRUDENCE— *Wischan v. Adler*

The effect of a bankruptcy filing upon an ongoing personal injury action was examined by the Fifth Circuit in *Wischan v. Adler (In re Wischan).*[7] The *Wischan* court, faced with a personal injury claim consisting of pre-petition medical expenses and pre- and post-petition pain and suffering, had to answer whether the debtor was entitled to any part of the proposed settlement funds.

The debtor urged a three-pronged argument in support of his claim to a portion of the settlement proceeds (at least the opinion alludes to a three-pronged argument). First, that federal bankruptcy law directs that the lawsuit, because settled post-bankruptcy, is *not* property of the estate. Second, that if the portion claimed by the debtor was found to be estate property, it was exempt. Third, that state law required that the settlement be bifurcated so that the portion related to compensation for post-petition pain and suffering is property of the debtor, solely. (We break these arguments into three because the Fifth Circuit did. Argument Number 3, though, seems to be a component of Argument Number 1, that the property is not estate property, but on the basis that the Bankruptcy Code cannot make it estate property because of state law, or something like that.)

Drawing from the language of § 541(a)(1)—"all legal and equitable interests of the debtor as of the commencement of the case" become property of the estate—and precedent such as *United States v. Whiting Pools, Inc.,*[8] *Tignor v. Parkinson,*[9] and *Sierra Switchboard Co. v. Westinghouse Electric Corp.,*[10] the Fifth Circuit concluded as a general matter that prepetition lawsuits were property of the bankruptcy estate notwithstanding the fact that they "may have borne fruit in settlement or judgment" post-petition.[11]

Having determined the plaintiff-debtor's pain and suffering recovery to be property of the estate, the court, called to do so by the debtor's claims, searched for an applicable Louisiana exemption. Noting that federal law provided an exemption for both

---

7. 77 F.3d 875 (5th Cir.1996).

8. 462 U.S. 198, 204–05, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) (interpreting § 541 expansively).

9. 729 F.2d 977, 980 (4th Cir.1984) (claim for injuries, either settled or unsettled as of the commencement of the case, are property of the estate).

10. 789 F.2d 705, 709 (9th Cir.1986) (prepetition claims are estate property notwithstanding their assignability or transferability).

11. *Id.* at 877.

non-pain and suffering personal injury losses as well as lost future earnings,[12] the *Wischan* court pointed out that Louisiana had "opted out" of the federal exemption provisions and had no analogous exemption. "Louisiana does not provide an exemption for proceeds from a personal injury claim, for future medical expenses, or for future pain and suffering." [13]

In support of the debtor's argument, that his pre- and post-petition pain and suffering claim should be bifurcated, with the post-petition portion characterized as property of the debtor, as opposed to property of the estate, the debtor relied upon a Louisiana Supreme Court decision concerning community property.

This Louisiana case [14] dealt with a claim by the husband for worker's compensation benefits that arose from an accident that occurred ten (10) days before dissolution of the community by legal separation. After the dissolution of the community, the wife asserted to a half interest in the proceeds from settlement of the compensation claim, on the basis that the claim or cause of action arose during the existence of the community. The Louisiana Supreme Court rejected her claim, we think on the basis of "equitable natural law and reason," [15] holding that the post-dissolution (of community) portion of the compensation settlement was the separate property of the husband, with only the minor part (ten days' worth) attributable to the community regime.[16]

The debtor in *Wischan* argued that the bifurcation under state law into community and separate property should be used to require the court to bifurcate the portion of the settlement dealing with post-petition pain and suffering, so that the estate's portion would be limited to pre-petition pain and suffering, with the remainder being the debtor's property. To the *Wischan* court, the state court opinion only exemplified a state's authority to legislate (and a state court's authority to construe) its community property regime, and did not support the debtor's argument that a bankruptcy court could create a "rule of bifurcation or exemption in bankruptcy for personal injury claims." [17]

It is partly because of this portion of the *Wischan* court's discussion that we consider publication of this opinion to be necessary. Rather than ending with an analysis of the federal law of what property is property of the bankruptcy estate (which it very easily could have done using its analysis of the function of the Louisiana Community Property law as its counterpoint), the court offers (we do not know, really, how to describe it) some practical dicta, specifically, as to why the post-petition pain and suffering portion of a personal injury claim **should not** be property of the debtor, but (we guess this is the point) rather should **fall into** the estate by default (because of the deficiencies inherent in the analytical capacity of bankruptcy judges):

> Even if bifurcation were conceivable, it is hardly practical. We note that appellants make no claim for post-petition loss of earnings or for pre- or post-petition medical expenses. Neither debtor lost post-petition earnings, and all pre- and post-petition medical expenses were, rightly or wrongly, reim-

---

12. Section 522(d)(11)(D) & (E) (West 1999) (debtor may exclude an amount "not to exceed $15,000, on account of personal bodily injury, not including pain and suffering or compensation for actual pecuniary loss").

13. *Wischan*, 77 F.3d at 877. *See* LA. REV. STAT. ANN. § 13:3881 (West 1994).

14. *West v. Ortego*, 325 So.2d 242 (La.1975).

15. *Id.* at 246.

16. The majority opinion was subject to three dissents, one of which begins, "This is one of the cases in which we should feel bound to permit the legislature to change the law." *Id.* at 249. We are curious about what type of cases would generate the "feeling" that it was OK for the court, as opposed to the legislature, to change the law.

17. *Wischan*, 77 F.3d at 877.

bursed as part of the attorneys' fees. Each seeks an allocation of damages to future, i.e. post-petition, pain and suffering. Bankruptcy courts are ill-equipped to divine the factual distinctions these appellants seek.[18]

■ Though easier said than understood, it is well settled that while a debtor's interest in property is initially determined to exist or not under state law, the question of whether a debtor's interest in property is property of the estate is a question of federal law. See, from a long time back, *Chicago Board of Trade v. Johnson.*[19] The Louisiana Supreme Court in *West v. Ortego,* conceded the husband's equitable (and even legal) interest in the workman's compensation claim as of the date of the creation of the cause of action. Given this, it is clear that the Louisiana law gave the husband sufficient legal or equitable interest in the proceeds to be received in the future for the interest to be vested as of the creation of the cause of action. Therefore, the legal and equitable interest, because of the preemptive federal law (§ 541(a)), is property of the bankruptcy estate, regardless of its bifurcation, by means of state matrimonial regimes law, into separate and community property.

Putting aside our personal reaction to this unnecessary foray,[20] we wonder why the court felt constrained to say, "*We note that Appellants make no claim for post-petition loss of earnings or for pre- or post-petition medical expenses ...*" We see the Fifth Circuit as having set litigation bait, by suggesting the possibilities of a different result for the debtor, under the hypotheticalized circumstances (of post-petition medical expenses and/or post-petition lost earnings).

Our case, then—post-petition medical expenses and perhaps lost earning capacity, as opposed to post-petition pain and suffering—requires us to re-examine *Wischan,* § 541, and Louisiana exemption law. We think that the comment in *Wischan* was meant to be a specific rebuttal to the debtor's Louisiana community property argument (though we are in fact hypothesizing since there is no real reason we can figure for the "note," and we can only suspect that it was "meant to be" a rebuttal, because there is no apparent connection between the argument and the rebuttal). We do not think that the "note" was meant to do what it did—leave the door open for a characterization of future medical expenses and/or lost future wages as property of the debtor.

However, there is no disputing that the words making up the "note," however irrelevant, are there. Even if the "note" was meant to plant a litigation seed by means of shadowy portents, we see it as nothing but dicta, think it ill-advised, and decline to follow it. We hold that the

---

**18.** *Wischan,* 77 F.3d at 877. We thank the Court very much for pointing out our inherent capacity limitations.

**19.** 264 U.S. 1, 44 S.Ct. 232, 68 L.Ed. 533 (1924).

**20.** We do not know what the Fifth Circuit thinks bankruptcy judges do on a daily basis. However, this Court (anyway) believes itself to be just as equipped to do what the Fifth Circuit says we are ill-equipped to do as are other courts. We will, however, point out a couple of things that the Fifth Circuit in its urge to wide-ranging "discussion" forgets to mention. First, a bankruptcy court's jurisdiction is limited. Therefore, we seldom, if ever, are asked to try the debtor's personal injury claims wherein damages, if the claim is tried, will be assessed by the trier of fact. Second, bifurcation of separate and community property, the determining of separate and community status of claims against the estate, and resolution of various other issues involving determinations of the separate and community status of property and claims are expressly provided for by various sections of the Bankruptcy Code. See § 541(a)(2); § 363(g), (i), (j); and § 726(c). See also, § 522. Therefore, it is very much a part of our daily work to determine community property issues, including the bifurcation of assets and claims.

Another thing. We are concerned that the Fifth Circuit would allow itself to be read as concluding that the question whether property is or is not property of the bankruptcy estate should be determined on the basis of how hard the answer is to get to.

future medical expenses portion of the settlement is estate property and, if any portion of the settlement can be said to compensate for lost earning capacity, that too is estate property.

## PROPERTY OF THE ESTATE

 Section 541(a)(1) specifies that "all legal or equitable interests of the debtor in property as of the commencement of the case" become property of the bankruptcy estate as of the filing of the petition.[21] We look to Louisiana law to determine whether, **as of the commencement of the bankruptcy case,** Mr. Ballard had a legal or equitable interest in the lawsuit.[22] A personal injury action in Louisiana requires both an "act" and its consequent

"injury."[23] "Act" encompasses damage caused by "negligence, imprudence, or want of skill," as well as an affirmative act.[24] Case law interpreting these provisions clearly holds that an act causing apparent injury gives rise to an action under Louisiana law, notwithstanding the fact that the full extent of the injuries suffered are unknown.[25]

 There is no argument in this proceeding about whether the accident caused the injuries for which the proposed settlement stands. Under Louisiana law, then, the cause of action which accrued pre-bankruptcy included the claim for medical expenses related to the injury caused by

**21.** *In re Wischan,* 77 F.3d 875 (5th Cir.1996); *see also, U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

**22.** *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *State Farm Life Ins. Co. v. Swift (In re Swift),* 129 F.3d 792 (1997). We are not asking the same question here that was incorrectly answered by the Fifth Circuit (contrary to its own precedent and, more importantly, Supreme Court precedent) in *Matter of Zedda,* 103 F.3d 1195 (1997). In that case the court was faced with the question of whether the undoing of a simulated sale of real property was the "transfer of an interest of the debtor in property" as that phrase is used in §§ 547 and 548. What the *Zedda* case, in its incorrectness, points out is that there can be an interest of the debtor in property under the avoidance statutes if, without the transfer, the property interest would have been property of the estate. It is possible, then, for the debtor under state law, to have an interest in property inferior to another (say, the transferee of a simulated sale whose interest is inferior to that of the transferor), but for that interest to be property of the bankruptcy estate because of the status of the trustee under § 544(a)(3). However, as the court in *Zedda* should have seen (and had seen on a number of prior occasions), the reason the interest goes into the estate is because under state law there is *some type of interest.* For example, in the simulation situation, a transferee can grant good title to a bona fide purchaser and can suffer the seizure and sale of the property subject to the simulation by the transferee's creditors (free and clear of the transferor's interest). *See,* LA. CIV. CODE ANN. arts. 2025–28. *See also,* Brandon A. Brown,

*What's the Matter with Zedda?,* 58 LA. L. REV. 1259 (1998).

**23.** LA. CIV. CODE ANN. art. 2315 (West 1997).

**24.** LA. CIV. CODE ANN. art. 2316 (West 1997).

**25.** *See Harvey v. Dixie Graphics, Inc.,* 593 So.2d 351 (La.1992) (Damage suffered must be actual and determinable—not speculative—but there is no requirement that quantum be either liquidated of fully incurred to create a right of action); *Nivens v. Signal Oil & Gas Co., Inc.,* 520 F.2d 1019 (5th Cir.1975), *amended on other grounds, rehearing denied,* 523 F.2d 1382, *cert. denied,* 425 U.S. 912, 96 S.Ct. 1509, 47 L.Ed.2d 763; *Lucas v. Commercial Union Ins. Co.,* 198 So.2d 560 (La. App. 1st Cir.1967). Although it is true that Louisiana law dealing with the so-called "discovery rule" and the accrual of actions can get very muddy if the injury is not apparent, such a situation is not present here. *See State Farm Life Ins. Co. v. Swift (In re Swift),* 129 F.3d 792 (1997) (discussing the distinctions between accrual for purposes of § 541 and accrual for purposes of the discovery rule in statutes of limitation (prescriptive periods in Louisiana) and the confusion between the two). *But see, Guderian v. Sterling Sugar & R. Co.,* 151 La. 59, 91 So. 546 (1922) (Plaintiff struck in head injuring optic nerve. Plaintiff had no reason to know the true extent of his injuries (although he had a gash on his head) and later went blind. Court ruled that plaintiff's action did not accrue—either as a claim or for prescription purposes—until plaintiff had reason to know of his injury.)

the fault of the tort feasor. It is clear that the debtor here, pre-bankruptcy, had a legal entitlement to make a claim for all damages, including future medical expenses that were or would be related to (caused by) the accident. Because of this state law legal and/or equitable interest, the property interest became property of the bankruptcy estate. We cannot fathom a basis for the Fifth Circuit, in *Wischan,* "noting" that it was not dealing with post-petition (future) medical expenses, as such a claim seems clearly to be property of the bankruptcy estate.

We reject, then, the possible argument that the Fifth Circuit was alluding to the possibility of a different result had the claim been for post-petition medical expenses. To believe the Fifth Circuit was so doing would require this Court to believe the Fifth Circuit capable either of intentionally ignoring or not understanding the most basic statutory directive of § 541(a). Even if our faith in the court could be shown to be misplaced, we note that the "note" is at most musing, non-conclusory dicta, unnecessary to the question facing the Court. Therefore, even if our faith be shaken, we deem it appropriate not to consider the "note" binding upon this Court.

Though the post-petition medical expenses question appears simple and the answer clear, there is perhaps more to discuss regarding the portion of the *Wis-chan* "note" pointing out that it was not faced with a claim for loss of post-petition

lost earnings. The debtor has asserted at least the suggestion that an undelineated amount could be grounded in the debtor's lost earning capacity.[26]

■ The lost earnings, or lost earning capacity question, is more complicated than that presented by the future medical expenses. Two reasons. First, one of the primary objectives of bankruptcy is the discharge, which provides the fresh start. Everyone knows that a debtor's post-petition wages, earnings, etc., absent some grounding in the pre-bankruptcy world, are not property of the estate. Also, the terms "earnings," "wages," etc. conjure up a corresponding exemption concern, regarding those earnings, wages, etc. that **do** have grounding in the pre-bankruptcy world.

Numerous cases have dealt with the post-bankruptcy lost earnings or loss of earning capacity question. Because of *Wischan* and the suggestion that such a claim may underlie a portion of the settlement amount, we address it here.

The general approach to the question of whether the loss of future earnings or earnings capacity cause of action is property of the estate involves the application of a broadly misplaced focus, upon § 541(a)(6) as the statutory exclusion of post-petition earnings from the estate. We say widely misplaced because we think it generally thought that § 541(a)(6) provides, for the spectrum of fact situations, the "earnings exclusion."[27] Because of

26. Apparently the debtor suffered no actual post-petition lost wages, as he was back at work by the commencement of this case. However, counsel suggests that had the matter gone to trial, the state court would have been presented with a lost earning capacity claim, on account of the severity of injury.

27. *See, e.g., In re Dillon,* 219 B.R. 781 (Bankr. M.D.Tenn.1998) (pursuant to Section 541(a)(6), proceeds from songs recorded post-petition excluded from estate); *In re Braddy,* 226 B.R. 479 (Bankr.N.D.Fla.1998) (pursuant to Section 541(a)(6), wages earned prepetition become property of the estate, but wages earned postpetition do not); *In re Norris,* 203

B.R. 463, 465 (Bankr.D.Nev.1996) (pursuant to Section 541(a)(6), postpetition earnings are not property of the estate of a Chapter 7 debtor, but earnings from services performed prior to bankruptcy but paid postpetition are property of the estate because such earnings do not arise from postpetition services of the debtor); *In re Bemish,* 200 B.R. 408 (Bankr. M.D.Fla.1995) (because the Chapter 7 debtor's postpetition earnings were excluded from property of the estate pursuant to Section 541(a)(6), the debtor did not need to claim her postpetition earnings as exempt); *In re DeSoto,* 181 B.R. 704 (Bankr.D.Conn.1995) (pursuant to Section 541(a)(6), a trustee may not retain for the benefit of a Chapter 7 bank-

this general understanding, there are many cases faced with the issue of whether a pre-bankruptcy cause of action for post-

bankruptcy loss of earnings, or earnings capacity, is property of the estate. These cases frame the issue as one arising under § 541(a)(6).[28]

ruptcy estate property which has been created postpetition through the postpetition efforts and earnings of the debtor); *In re Raper*, 177 B.R. 107 (Bankr.N.D.Fla.1994) (pursuant to Section 541(a)(6), postpetition wages are not part of the Chapter 7 estate, and therefore credit union violated the automatic stay by continuing postpetition to accept voluntary payroll deductions initiated prepetition in the good faith belief that the Chapter 7 debtor was voluntarily continuing payments and by applying those payments to the debt); *In re Michaels*, 157 B.R. 190 (Bankr.D.Mass.1993) (pursuant to Section 541(a)(6), Chapter 7 debtor's earnings from services performed postpetition were not property of the estate); *In re Passmore*, 156 B.R. 595 (Bankr.E.D.Wis. 1993) (pursuant to Section 541(a)(6), postpetition income of Chapter 7 debtor is not property of the estate); *In re Anders*, 151 B.R. 543 (Bankr.D.Nev.1993) (postpetition spousal support payments owing to Chapter 7 debtor-wife did not constitute "earnings," within the meaning of Section 541(a)(6), as payments were not derived from postpetition services performed by the debtor, and therefore were not excluded from property of the estate pursuant to Section 541(a)(6)); *In re Zrubek*, 149 B.R. 631 (Bankr.D.Mont.1993) (military pension benefits were not "wages" under the Federal Uniform Services Former Spouses Protection Act, and therefore were not excluded from property of the Chapter 7 debtor's estate pursuant to Section 541(a)(6)); *In re Becker*, 136 B.R. 113, 115 (Bankr.D.N.J.1992) (pursuant to Section 541(a)(6), postpetition earnings from services performed by the Chapter 7 debtor are not property of the estate, and therefore, proceedings to collect alimony, maintenance or support from such earnings are not subject to the automatic stay); *In re Martin*, 117 B.R. 243, 248 (Bankr. N.D.Tex.1990) (money due to Chapter 7 debtor-business consultant for postpetition services were excluded from property of the estate pursuant to Section 541(a)(6)); *In re Daugherty*, 117 B.R. 515 (Bankr.D.Neb.1990) (pursuant to Section 541(a)(6), earnings from postpetition services of Chapter 7 debtor are not property of the estate, and therefore the debtor's postpetition wages may be garnished to enforce claims for alimony, maintenance, or support without obtaining relief from the automatic stay); *In re Calder*, 94 B.R. 200 (Bankr.D.Utah 1988) (pursuant to Section 541(a)(6), postpetition wages and earnings of the Chapter 7 debtor are excluded from property of the estate, but wages earned prepetition and paid postpetition are not excluded);

*In re Meade*, 84 B.R. 106 (Bankr.S.D.Ohio 1988) (pursuant to Section 541(a)(6), postpetition wages of the Chapter 7 debtor are excluded from property of the estate, but wages earned prepetition and paid postpetition are not excluded); *In re Palmer*, 57 B.R. 332 (Bankr.W.D.Va.1986) (postpetition year-end bonus paid by Chapter 7 debtor's employer was not property of the estate under Section 541(a)(6), because debtor's receipt of the bonus was conditioned in part on his employment on a date almost six months postpetition, on debtor's satisfactory job performance postpetition and on a determination by the chief executive officer of the employer that debtor was entitled to receive the bonus); *In re Whisenton*, 40 B.R. 468 (Bankr.D.C.1984) (postpetition earnings of Chapter 7 debtor are excluded from the property of the estate pursuant to Section 541(a)(6), and therefore debtor's postpetition transfers of wages pursuant to voluntary wage-allotment agreement could not be avoided by the Chapter 7 trustee or the debtor).

**28.** *See, e.g., In re Coltellaro*, 204 B.R. 640 (Bankr.S.D.Fla.1997) (pursuant to Section 541(a)(6), lost future wages that a state court would award to the Chapter 7 debtor-seaman, in his pending suit against his employer for injuries suffered while working aboard a cruise ship, would not be property of the estate, because if the debtor had not been injured but had filed for relief under Chapter 7, such future wages would have been earned postpetition and therefore would have been excluded from property of the estate pursuant to Section 541(a)(6)); *In re Goins*, 181 B.R. 45 (Bankr.S.D.Ohio 1994) (the value of the debtor's claim for reinstatement was not excepted from property of the estate pursuant to Section 541(a)(6), because the proceeds of the proposed settlement of the debtor's claim were not conditioned upon actual performance of postpetition services by the debtor, despite the debtor's contention that reinstatement would necessarily involve postpetition services); *In re Lerocque*, 164 B.R. 4 (Bankr. D.N.H.1994) (portion of settlement on a prepetition cause of action that was attributable to compensation for lost future earnings was not excluded from the Chapter 7 debtor's estate pursuant to Section 541(a)(6), because "earnings from services performed" means that the debtor must actually have performed such services postpetition, not merely that the debtor receive compensation for lost future

The arguments as framed by the parties and resolved by the courts are exemplified by *In re Coltellaro*,[29] an example of resolution of the issue in the debtor's favor (others go the other way). The debtor in *Coltellaro* sought to retain proceeds from his pre-petition cause of action under various theories. As to that portion of the action attributable to "lost future wages," the court held that such a recovery would not be property of the bankruptcy estate because "if the Debtor had not been injured but still filed bankruptcy under Chapter 7, then these future wages would have been earned post petition and not included in his bankruptcy estate. 11 U.S.C. § 541(a)(6)."[30] Because of its framing of the issue as one involving § 541(a)(6) as the source of the "earnings exception" to the provisions of the Code delineating the property that becomes property of the bankruptcy estate at the commencement of the case, the *Coltellaro* court uses part of the section's wording as the basis for the question whether performing services is required for the "earnings" to fall within the "earnings exception," or whether receiving money for not performing services that you can't perform but would if you could is sufficient. Because of this focus upon § 541(a)(6), however, the *Coltellaro* court (as well as the others who have so framed the issue) forgot two very important things. First, to read the statute. Second, that it is analytically problematic to construct a hypothetical fact situation (would the debtor have

"earned" the money post-petition if she had not been hurt?) because, simply, the debtor was hurt pre-bankruptcy and therefore what might have happened in the future is merely a way of valuing a pre-petition asset—the cause of action. As we will try to establish, the wording of § 541(a)(6) makes clear that it is not the general earnings exclusion, so the question framed within the context of this inapplicable section is therefore irrelevant. The general "earnings exception" or "earnings exclusion" is not found in § 541(a)(6).

The author of this opinion has previously participated in the writing of an article which attempts to show that § 541(a)(6) is not the source of the general "earnings exemption," but rather excludes from the estate only those earnings of the debtor from post-petition services that are *derived from estate property*,[31] as proceeds, product, profit, rents, ... whatever, of or from estate property. In other words, the supposed earnings exception of § 541(a)(6) presumes that the monies being paid to the debtor are being paid out of the estate, for personal services rendered by the debtor to the estate after the commencement of the bankruptcy case, and, that if they were not being paid to the debtor for services performed for the estate, would be property of the estate.

■ Section 541(a)(1) is the section that the *Coltellaro* court and the other noted courts were looking for. Section 541(a)(1) excepts from the estate all (or almost all)

---

earnings); *In re Carson*, 82 B.R. 847 (Bankr. S.D.Ohio 1987) (portion of tort settlement which constituted claim for future lost wages was property of the Chapter 7 bankruptcy estate, because the earnings exception, Section 541(a)(6), requires that the debtor actually perform services postpetition).

29. 204 B.R. 640 (Bankr.S.D.Fla.1997).

30. *Id.* at 644–45. Section 541(a)(6) reads as follows:

**§ 541. Property of the estate**
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all

the following property, wherever located and by whomever held:
\* \* \*
(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

31. See, Louis M. Phillips and Tanya Martinez Shively, *Ruminations on Property of the Estate—Does Anyone Know Why a Debtor's Postpetition Earnings, Generated By Her Own Earning Capacity, Are Not Property of the Bankruptcy Estate?* 58 LA. L. REV. 623 (Winter, 1998).

legal or equitable interests **of the debtor in property obtained or received post-petition,** by including in the estate all legal and equitable interests of the debtor in property as of the commencement of the case.[32] We set forth the two portions of § 541 below to properly frame the dichotomy.

## 11 U.S.C. § 541. Property of the estate

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all of the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests if the debtor in property as of the commencement of the case.

\* \* \*

(6) Proceeds, products, offspring, rents, or profits of or from property of the estate, *except such as are* earnings from services performed by an individual debtor after the commencement of the case.

(emphasis added).

■ Section (a)(1) includes in the estate the debtor's property interests existing as of the petition date. Section (a)(6) includes in the estate certain *post-petition* property—proceeds, products, offspring, rents, or profits—earned *from or by* estate property. Stated differently, if estate property generates proceeds, products, offspring, rents, or profits, those proceeds, products, offspring, rents, or profits, are property of the estate as well, unless such (proceeds, products, offspring, rents, or profits) are post-petition earnings from

services performed by an individual debtor.

We use the Bates' Motel to illustrate. Norman (or Norman as his mother, we guess) files Chapter 7 bankruptcy. The trustee must administer the motel and (as this is a movie) knows nothing of the nefarious goings-on within it. In fact, Norman, at first blush, seems rather normal. Thinking initially that an operating motel is more valuable than a closed one, the trustee (subject to court approval) negotiates with Norman an arrangement whereby Norman will operate the motel for the estate and will receive a set salary, plus lodging for him and his mother (they only need one room). The rents, proceeds, profits, or whatever you call the motel revenues are property of the estate, being generated by the estate property—the motel. However, that portion of the revenues which constitutes earnings for Norman's services rendered post-petition (to the estate) are not property of the estate. Norman has a property interest in, to, and upon the particular source of revenue to the extent of his earnings.[33] But the (a)(6) exception does not exclude post-petition wages received by the debtor from sources outside of the estate.

Nor does § 541(a)(6) need to exclude such earnings from the estate—(a)(1) has already done so. Wages for recurring work payable for the recurring work post-petition to the debtor by a non-estate entity are not "legal or equitable interests if the debtor in property as of the commencement of the case." The debtor has no interest in wages that he will earn next week; the Bankruptcy Code also excludes from being brought into the estate certain contracts that might give the debtor, per-

---

**32.** We make this statement with recognition that other provisions of § 541 bring into the estate property post-bankruptcy. However, post-bankruptcy property is specifically provided for and is only brought into the estate as specifically provided by the other provisions of § 541.

**33.** As we point out the *Ruminations* article, we think the reason for the structure is to avoid the argument by a garnishment lien creditor that the lien extends to property of the estate, and therefore to post-petition revenues of the estate that go to pay the debtor. *See, Ruminations,* 58 LA. L. REV. at 636.

sonally, a cognizable contractual right to perform services for pay.[34]

■ This analytical flaw in *Coltellaro* leads the Court to the question (asked by all courts stuck on § 541(a)(6) as the "earnings exception"), whether the debtor earned the money from "services performed ... after the commencement of the case." The *Coltellaro* court finds that the debtor's wages are not estate property because had the debtor not been injured the wages would have been earned post-petition. To us the statute read clear and plainly does not, through § 541(a)(6), exclude from the estate all of a debtor's post-petition earnings. The problem with the mis-reading of the statute is borne out by the reams of opinions dissecting the issues of work for money versus being paid for not being able to work. The question generated by § 541(a)(6) has nothing to do with whether the earnings are property of the estate; the earnings have to be (or come from) property of the estate before § 541(a)(6) is implicated. The focus upon § 541(a)(6) as the general earnings exclusion ignores the real question, which is whether there is a distinction between future earnings and a pre-petition cause of action for lost future earnings or earning capacity. While it is true that the debtor's post-petition earnings would not have been property of the estate (because of § 541(a)(1), not § 541(a)(6)), it does not follow that proceeds from a pre-petition lawsuit asserting a claim for lost post-petition earnings are excluded from the estate as well. The cause of action for lost post-petition wages is itself a pre-petition interest in property. The perform/did not perform question is irrelevant. The example used demonstrably in *Wischan* is helpful:

> The fact that the causes of action may have borne fruit in settlement or judgment after commencement of the bankruptcy case does not transform them into post-petition property of the debtor—excluded from the bankruptcy estate—any more than post-petition payments on a pre-petition note owed to the debtor would be excluded from the estate.[35]

The logic in this statement of the Fifth Circuit is identical to ours (we are somewhat surprised). The pre-petition note—or cause of action—is property of the estate. Payments upon the note—or proceeds derived from the lawsuit—are also property of the estate.

The first question, if the inquiry is properly founded, is whether at the commencement of the case the debtor has a legal or equitable interest in the property. If so, the asset is property of the estate. An analysis that first asks whether the debtor performed services post-petition leads, ineluctably, to the question whether the proceeds should stand for earnings for services that would have been rendered but for the injury. Figuring out the answer to this question is like typing a line of text starting on the wrong key. You will get to the line but it won't say what it should. Leave § 541(a)(6) out of the analysis altogether (unless the debtor is working for the estate—but wouldn't the court already know this?), because answering the question "did the debtor perform services/is the

---

**34.** See 11 U.S.C. § 365(c)(1), which reads as follows:

**§ 365. Executory contracts and unexpired leases**

\* \* \* \* \* \*

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment; or

\* \* \*

**35.** *Wischan,* 77 F.3d at 877.

money for services the debtor would have performed but couldn't," all but requires that the fact that the asset is an asset prior to bankruptcy and therefore is property of the estate, must be overlooked.

## EXEMPT PROPERTY

■ The fact that the pre-petition cause of action for lost earnings is a vested interest in property that causes it to become (on the commencement of the case) property of the estate, requires that we answer the question of whether there is an applicable exemption that is claimable.[36] Since Louisiana has "opted out" of the federal exemptions, we look to Louisiana law to determine whether any exemption applies.

■ A portion of the settlement that is "earmarked" for the debtor and is alleged to be comprised of "future medical expenses."[37] The only exemption that is possibly applicable to future medical expenses is that of LA. REV. STAT. ANN. § 13:3881(A)(4)(a)[38]—"equipment for required therapy." But there is no such evidence presently before us.

There have also been "rumblings" regarding "lost earning capacity,"[39] which generates the possibility of exemption of a portion of the settlement pursuant to R.S. § 13:3881(A).

## THE LOUISIANA EXEMPTION STATUTE

There is no exemption within Louisiana law specifically extending to tort causes of action or the proceeds on recovery from tort causes of action. Therefore, the only possible basis for an exemption claim is what we will designate the "earnings exemption," found at R.S. § 13:3881(A)(1). This provision reads as follows:

§ 3881. General exemptions from seizure

A. The following income or property of a debtor is exempt from seizure under any writ, mandate, or process whatsoever:

(1) (a) Seventy-five percent of his disposable earnings for any week, but in no case shall this exemption be less than an amount in disposable earnings which is equal to thirty times the federal minimum hourly wage in effect at the time the earnings are payable or a multiple or fraction thereof, according to whether the employee's pay period is greater or less than one week. However, the exemption from disposable earnings for the payment of a current or past due support obligation, or both, for a child or children is fifty percent of disposable earnings, and the exemption from seizure of the disposable earnings for the payment of a current or past due support obligation, or both, for a spouse or former spouse is sixty percent of the disposable earnings. For purposes of this Subsection, if the Department of Social Services is providing support enforcement services to the spouse and a judgment or order for support includes an obligation for both a child or

36. The debtor's post-petition earnings from the estate under § 541(a)(6) are not subject to a claim of exemption because there is no vested interest as of the commencement of the case.

37. Taking a page out of the *Wischan* handbook, we note that we are not dealing with medical expenses incurred post-petition, but those which, because of the injury, are claimed by the debtor to be expenses which will have to be incurred in the future. Therefore, the question whether a medical provider can perfect a lien claim under state law post-petition (doubtful) is not before us and neither is the question whether the provider is entitled to § 503(b) administrative priority on the ground that the rendering of medical treatment provided a benefit to the estate by making the estate's personal injury claim worth more, so that the expenses related to the post-petition medical treatment are entitled to administrative expense priority under § 503(b).

38. From this point forward Louisiana Revised Statutes will be referred to as "R.S. § ___".

39. *Letter from Bennett Boyd Anderson, Jr.,* May 19, 1998.

children and a spouse or former spouse, or in any case wherein the judgment or order does not clearly indicate which amount is attributable to support of the child or children and which amount is attributable to support of the spouse or former spouse, the support obligation shall be treated as if it is exclusively for the support of a child or children.

(b) The term "disposable earnings" means that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by law to be withheld and which amounts are reasonable and are being deducted in the usual course of business at the time the garnishment is served upon the employer for the purpose of providing benefits for retirement, medical insurance coverage, life insurance coverage and which amounts are legally due or owed to the employer in the usual course of business at the time the garnishment is served.

■ We must look to Louisiana law for the method of statutory interpretation to be used to determine the scope of the "earnings exemption." We have discussed the Louisiana scheme in some depth previously,[40] but always in the context of a case in which we found the statute or language unambiguous. As we will see, more work needs to be done here.

## LOUISIANA STATUTORY INTERPRETATION; THE DIRECTIVES

The Louisiana plain meaning rule is plainly set out in Civil Code Article 9. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may

be made in search of the intent of the legislature."[41] Regarding the meaning of words, Article 11 provides that "[t]he words of a law must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the law involves a technical matter."[42] If the language is susceptible of different meanings, Article 10 requires that ". . . it must be interpreted as having the meaning that best conforms to the purpose of the law." According to Article 12, if the words are ambiguous, ". . . their meaning must be sought by examining the context in which they occur and the text of the law as a whole." Civil Code Article 13 requires that "[l]aws on the same subject matter must be interpreted in reference to each other," but this has been interpreted to apply only when the language of the statute is ambiguous,[43] or, perhaps, where the words are susceptible of different meanings.

We note, first, that "disposable earnings" is a term defined within the exemption statute itself, though the definition is basically a means of carving out what earnings are "disposable" through a description of the various deductions from "earnings" that are to be taken off the top of an individual's "earnings" to get down to the "disposable" portion subject, in part, to seizure.

This leaves us with the further chore of defining "earnings" as the word is used in the exemption statute, because the defined term ("disposable earnings") pre-supposes an understanding of "earnings."

## IS THE MEANING OF "EARNINGS" CLEAR AND UNAMBIGUOUS?

According to *Webster's II New Riverside University Dictionary*, "earnings" means "[s]omething earned, esp.: a. Sala-

---

40. *In re Brown*, 189 B.R. 653 (Bankr.M.D.La. 1995); *In re Black*, 225 B.R. 610 (Bankr. M.D.La.1998).

41. *See also*, R.S. § 1:4 (West 1999).

42. *See also*, R.S. § 1:3 (West 1999).

43. *Grennon v. New Orleans Public Service, Inc.*, 17 La.App. 700, 136 So. 309 (1931).

ry or wages. b. Business profits. c. Investment gains." [44] "Earn" means "1. To gain esp. for the performance of service or work. 2.a. To acquire as a result of effort or action.... 3. To produce as profit or return." [45]

*Black's Law Dictionary* defines "earnings" as "[i]ncome. That which is earned; *i.e.,* money earned from performance of labor, services, sale of goods, etc. Revenue earned by an individual or business. Earnings generally include but are not limited to: salaries and wages, interest and dividends, and income from self-employment. Term is broader in meaning than 'wages'." [46]

*Webster's Ninth New Collegiate Dictionary* defines "earnings" as "1: something (as wages) earned 2: the balance of revenue after deduction of costs and expenses." [47] "Earn" is therein defined as "1 a: to receive as return for effort and esp. for work done or services rendered b: to bring in by way of return (bonds [earn]ing 10% interest) ..." [48] *Webster's New World Dictionary, Third College Edition,* defines "earnings" as "1 wages, salary, or other recompense earned by working 2 money made by an investment or an enterprise; profits." [49] "Earn" is defined as "1. to receive (salary, wages, etc.) for one's labor or service 2. to get or deserve as a result of something one has done 3 to gain (interest, etc.) as profit ..." [50]

The thread running through the various definitions of the verb "earn" and the noun "earnings" is that "earnings" are value given or due for the actual performance of services or investment of capital, without regard (as regards the individual) to the capacity or ability to earn. The word indi-cates that there might be costs associated with the act and consequence of earning, that the earnings, for example, might be subject to tax.

The term "earnings," therefore, encompasses value, compensation, or return grounded in the performance of activity, work, business operation, etc. We can designate this type as "active" earnings. As well, "earnings" encompasses the return or investment of capital, which involves no action or performance on the part of the investor after the act of investment. We can designate this type as "passive" earnings. Though in one sense these dual facets of the meaning of the term "earnings" do not give rise to "different meanings," they do make clear that there are types of earnings that are conceptually distinct regarding the rights of creditors. Active earnings are the fruits, compensation, etc. generated by the work of an individual and, therefore, the source of the active earnings, the person, is not susceptible of ownership of or seizure by another. [51] A creditor of the person who earns by working cannot obtain a property interest in the thing that produces the earnings because it is not a thing, it is a person. A person does not own himself or herself, so it is impossible to say that a person could have a vested property right in, to and upon himself. Constitutional prohibitions against slavery and indentured servitude preclude a person being owned by or bound to another for the purposes of affording the other a property interest in the person. Therefore, a creditor of a person can only obtain a property interest in the property of the debtor and, with regard to

**44.** *Webster's II New Riverside University Dictionary* (1984), p. 414.

**45.** *Id.*

**46.** *Black's Law Dictionary,* 6th Ed. (1990), p. 509.

**47.** *Webster's Ninth New Collegiate Dictionary* (1990), p. 392.

**48.** *Id.*

**49.** *Webster's New World Dictionary, Third College Edition* (1988), p. 426.

**50.** *Id.*

**51.** From the bankruptcy perspective, this fact is recognized by, for example, § 365(c)(1) of the Code.

active earnings, it is only upon the earnings, once earned, that a vested property interest can be obtained.

Passive earnings are different. Passive earnings, as we have defined them, are produced, not by the person, but by property of the person. The earnings generated by the act of investment are a component of the value of the thing invested. The creditor can obtain a property interest in the passive earnings in one of two ways—either by seizure of the passive earnings or by seizure of the underlying asset.

In one sense, then, earning are earnings. In another, when looked at as used within the earnings exemption statute, the conceptual difference in types of earnings requires that we declare that the term "earnings," as used within the statute, is not clear and unambiguous. If "earnings" is limited to active earnings, then the exemption statute is limited to the fruits of actual performance of services. If, however, "earnings" is interpreted to include passive earnings, then it is clear that the earnings exemption is broader in scope, protecting not only the earnings stream but also the underlying asset to the extent that it produces the portion of the passive earnings stream subject to the exemption. In other words, because a person cannot be owned, exempting a portion of the active earnings in no way extends the exemption to other assets, because the person doing the earning is not an asset. If the passive earning stream is covered by the earnings exemption, then the underlying asset, which is property (presumably subject to seizure), must also be exempt so as to be available to the debtor for the purpose of producing the exempt earnings (at least to the extent (or value) necessary to produce the exempt earnings).

We conclude that figuring out this question is a necessary step to answering our ultimate question, whether the loss of earning capacity cause of action is covered by the earnings exemption. The reason?

As we will see, the loss of earning capacity cause of action is property, separate and apart from earnings. Determining the scope of the earnings exemption (broad so as to include passive earnings; narrow as to include only active earnings) will bring us to our answer because (again as we shall see) exemption of the proceeds from the enforcement or settlement of a loss of earnings capacity claim necessitates extension of the earnings exemption to the cause of action (the underlying asset) itself.

Our inability to read the term "earnings" as clear and unambiguous is not ameliorated through the language by which the amount of earnings subject to the exemption is calculated. This language, by which the minimum value (or amount) of the exemption (or of "earnings" that are exempt) is created, reads "[s]eventy-five percent of his disposable earnings for any week, but in no case shall this exemption be less than an amount in disposable earnings which is equal to thirty times the federal minimum hourly wage in effect at the time the earnings are payable or a multiple or fraction thereof, according to whether the employee's pay period is greater or less than one week." One analysis of this language is that the exemption extends only to earnings that are earned by active performance of job duties for an agreed-upon compensation rate to be paid according to fixed periodic payment schedule. Clearly, the statute requires that the minimum amount of earnings subject to the exemption be calculable at a rate of no less than 30 times the federal minimum hourly wage, per week, with the person-by-person calculation to be made by application of either a multiplier or divisor, depending upon whether the "employee's pay period" is more or less than one week. (If the pay period is a two-week pay period, the minimum exemption would be 60 times the minimum hourly wage; if the pay period is twice weekly, the minimum exemption would be 15 times the minimum hourly wage, etc.) From this focus, we

might rationally limit the application of the earnings exemption to employees who are paid according to a fixed wage schedule. However, there is another rational approach that conceivably could extend the statute to passive earnings.

Though the part of the statute providing the method of calculation of the minimum exemption refers to "the employee's pay period," the definition of "disposable earnings" refers to "that part of the earnings of **any** individual . . ." Though this section refers to the allowable off-the-top deductions at the time of service of the garnishment "upon the employer," including amounts "legally due or owed the employer . . .," the definition of "disposable earnings" does not on its face seem to require, necessarily, an employer/employee relationship or limit the earnings exemption to "employees." [52] It is not much of a step to be able to generate an average monthly or even weekly earnings schedule comprised of passive earnings so as to back into the proper multiplier or divisor to be used to calculate an exempt amount. It is easier, of course, if we are dealing within a weekly, biweekly, or monthly pay schedule; easier but not necessary.

So, while the calculation provisions (and, as well, the definition provisions) may assist us down the road, on the face of the statute we cannot find the scope of the earnings exemption to be clearly or unambiguously delineated.

Our "without more" analysis of the language is, we believe, supported by the existent Louisiana case law on the earnings exemption. While we find no case that has squarely addressed the question of whether the earnings exemption is ambiguous, we offer the following discussion of Louisiana state appellate court decisions in support of our conclusions that the statute at least includes a term (earnings) that has different meanings and is probably, in its use of the term, ambiguous as to the type of earnings subject to the exemption. Additionally, we will call upon our caselaw discussion later in support of the analysis by which we develop an understanding of what type of earnings are covered by the exemption and whether the loss of earnings cause of action (and/or proceeds therefrom) is to any extent protected.

## LOUISIANA CASE LAW

We have not located a dispositive Louisiana Supreme Court opinion on the definition of "disposable earnings." The appellate cases that have interpreted the term, though not dispositive of our ultimate question, do provide insight into the questions that have been analyzed by the Louisiana state courts, and provide us with support for our conclusion that the statute cannot be clearly and unambiguously understood solely on the basis of the language.

In the case *Hastings v. Dinning* [53] the state appellate court dealt with a garnishment judgment fixed by the lower court as a percentage of the entirety of the husband's monthly earnings, which were designated as follows: $100 per week salary; $230.50 monthly house note payment; $500 per month for household expenses; $250

---

**52.** As does another Louisiana law relating to compensation issues. *See,* R.S. § 23:631.

§ 631. Discharge or resignation of employees; payment after termination of employment

A. (1)(a) Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, not later than three days following the date of discharge.

(b) Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of resignation, whichever occurs first.

La.Rev.Stat. Ann. § 23:631 (West 1999).

**53.** 314 So.2d 744 (La.App. 3rd Cir.1975).

per month for personal insurance premiums and use of automobile. The husband argued that only the $100 per week salary could be garnished, and that after deduction of taxes, etc. the disposable earnings amounted to $79.00 per week. Without much heavy lifting, the court characterized the amounts additional to the "salary" as sufficiently "earnings" to comprise (along with the salary) the base earnings per month upon which to calculate the "disposable earnings."

The case *C.H. Rice & Son, Inc. v. Stassi*[54] involved a predecessor to the present exemption statute[55] which limited the "wage, salary, commission or other compensation" subject to seizure so that at minimum of $60.00 per month was exempt. In this case a judgment creditor seized funds held by the constable for the benefit of the judgment debtor, who had previously obtained a seizure against a former employer upon a judgment for commissions due (as a real estate salesman). The judgment debtor (Stassi) initiated a proceeding to release the seizure, claiming the funds to be exempt. The exemption argument was that because the funds ($50.16) amounted to less than $60.00, seizure was improper. According to the court, the judgment debtor had received more than $60.00 during the month for which the commissions held had been earned. Stassi, however, argued that "in determining whether any such seized funds is exempt, [the court] must not take into consideration any amount which may already have been drawn by the employee, but must look at the matter as though the seized amount represented the entire earnings of the judgment debtor during the particular month under consideration."[56]

The court rejected this argument, concluding that the intent of the legislature was to consider the exemption in light of the actual amount earned during a particular month, that "each month should be considered separately and that out of each month's earnings (80% or $60, whichever is greater) should be held to be exempt."[57]

In *Jones v. Commagere*,[58] the seizing creditor was met with answers to garnishment interrogatories claiming that the garnishee, the corporation employing the judgment debtor, owed no money to the debtor, and that withdrawals over his monthly salary of $60.00 had been loans by the company to the judgment debtor. The creditors sought to traverse the answers, and the court analyzed the set-up as one to shelter salary (by fixing it at the monthly exempt amount). The court calculated the withdrawals during the prior months and determined that all amounts paid were in fact salary. The court characterized the relationship between the judgment debtor and the complying company as follows:

> We are convinced that there was no intention to consider Commagere's withdrawals in excess of his stated salary of $60 per month as an indebtedness due the corporation and that the corporation was run in the interest of Commagere, Jr., with the idea that he would receive as compensation whatever might be safely withdrawn from its earnings. It was practically an incorporation of Commagere's earning capacity. It follows that the authorized salary of $60 does not represent his earnings or compensation received from the corporation.[59]

The court, notwithstanding its suggestion that the relationship was an incorporation of earning capacity, focused only upon the amounts actually withdrawn in calculating the amount due as of the garnishment (and thereafter). This amount was calculated on an average monthly ba-

---

54. 8 So.2d 805 (La.App.Orleans 1942).

55. Section 1 of Act 183 of 1932, which amended the Louisiana Code of Practice Article 644.

56. *Id.* at 806.

57. *Id.*

58. 181 So. 198 (La.App.Orleans 1938).

59. *Id.* at 199.

sis (the withdrawals had been irregular), and the court did not consider the value of the incorporated earning capacity.

The case *Laurencic v. Jones* [60] involved the attempted garnishment of the last paycheck of the judgment debtor, which had not been paid by the employer (apparently the debtor had left the employment and had not made subsequent contact). The creditor argued that once employment had been terminated, the earnings that had remained unpaid lost their exempt status and, alternatively, that abandonment of the earnings caused a loss of the exemption. The court noted that the version of § 3881 then in effect (which read, "eighty percent of the wages, salary, commissions, or other compensation earned by him") was broader than the predecessor statute, Article 644 of the Code of Practice, which had limited the earnings exemption to monies earned during the 31 days before seizure, and concluded that "the intent of the present statute is that 80% of all wages, whenever paid or whenever due, are exempt." [61] Though the court suggested that if the debtor had "absconded and abandoned his salary, never intending to claim it, it might not be subject to the exemption," [62] the court found that the last paycheck due had not been abandoned. The exemption claim was therefore sustained.

The next two cases bear more directly upon our inquiry, as they deal with the question whether the earnings exemption is limited in applicability to earnings accruing from employment, or can be asserted in connection with earnings that may have taken another form. Unfortunately, the cases shed little light, as they are from the same appellate circuit and, though one attempts to distinguish itself from the other, they are in fact contradictory.

In the case *Legier v. Legier*, [63] the judgment creditor was the wife, who sought to collect a judgment for past due child support through an execution upon the debtor's interest in two funds, held by trustees and administrators for the benefit of longshoremen. The funds were designated as "a pension and vacation fund," and "a royalty escrow fund" (which contained "earned but unpaid wage benefits"). [64]

The trial court, hearing a contest over the garnishment interrogatories, had held the funds subject to seizure but also that the funds attributable to the debtor's interests were to be turned over to the sheriff " 'subject to the exemptions provided by law.' " [65]

On appeal the seizing creditor reargued that the exemption statute did not protect any portion of the money held within the two funds. The court agreed, concluding that the reference within the statute to the protection afforded over " '75% of a debtor's disposable earnings for any week' " and the statutory reference to the "pay period," indicated legislative intention for "the exemption to apply to garnishment of weekly, biweekly or monthly earnings at the time they are paid to the employee." [66] " . . . [A]lso [said the court] the exemption does not apply to accumulated fringe benefits which have accrued prior to the garnishment." [67]

The *Legier* court found support in the holding of the United States Supreme Court in *Kokoszka v. Belford*, [68] in which the Court concluded that the exemption provided in the federal Consumer Credit Protection Act did not apply to a prebankruptcy tax refund because the exemp-

---

**60.** 180 So.2d 803 (La.App. 4th Cir.1965).

**61.** *Id.* at 804.

**62.** *Id.*

**63.** 357 So.2d 1203 (La.App. 4th Cir.1978).

**64.** *Id.* at 1204.

**65.** *Id.* at 1205.

**66.** *Id.* at 1206.

**67.** *Id.*

**68.** 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974).

tion was limited to " 'periodic payments of compensation and do not pertain to every asset that is traceable in some way to such compensation.' " [69]

To the *Legier* court the income tax refund was analogous to "the husband's accrued fringe benefits," and as such, while "related to his labor, the accumulated fund is not a periodic payment subject to exemption." [70] The court clearly did not consider the nature of the judgment debt: "Having so concluded, we need not address plaintiff's argument that the exemption does not apply to enforcement of an executory judgment for unpaid accumulated child support." [71]

The court was faced with a request for rehearing which was denied. One of the judges issued a concurrence in the denial of rehearing which is quoted, as follows:

> There is absolutely no evidence in this record regarding the funding, accumulation, purpose or method of distribution of vacation and holiday pay. If it were shown that this pay served to provide defendant with a substitute for his regular "disposable earnings" which he did not receive during periods of vacation or on holidays, we would have to decide whether the exemption applied. But since no evidence indicates these funds are qualified for the exemption, our decision on original hearing properly denied the exemption. [72]

The *Legier* case was followed by the case *First National Bank of Commerce v. Latiker*. [73] Again, the Louisiana Fourth Circuit was faced with an attempted seizure of a judgment debtor's interest in the pension, welfare, vacation and holiday funds established for longshoremen (but, apparently, not the royalty escrow fund).

The lower court, despite *Legier*, had excluded 75% of the debtor's interest from seizure as exempt under § 3881. The seizing creditor appealed, citing *Legier*.

The same Louisiana Fourth Circuit purported to distinguish *Legier*, on its way to holding that the exemption was applicable. Notwithstanding the clear pronouncement, in *Legier*, that the nature of the obligation was irrelevant, the *Latiker* court distinguished it "because that seizure was for payment of child support; the policy considerations which presumably play a role in that decision are not present in a case such as the instant one ..." [74] Of course, this presumption is plainly contradicted by the *Legier* opinion itself.

Not satisfied with this distinction (and correctly so), the court determined another factual basis for distinguishing the second case. "We also decline to follow the *Legier* decision because another distinction is readily apparent; the nature of the fund was not fully explained in the *Legier* case." [75] According to the *Latiker* court, it was the beneficiary of much factual information that established that the holiday and vacation funds were comprised of a portion of an employee's wages, deducted weekly, and held in trust pending the annual (in December) distribution. Therefore, the employee's interest is "nothing other than deferred payment of wages, and the name of the fund is a misnomer." [76] The court concludes that the deducted amounts, though not paid weekly, "are wages nonetheless, and part of their weekly disposable earnings ... [so that] 75% of this deferred income is exempt from seizure..." [77]

The *Latiker* case was subject to a dissent which, though it substantively sup-

---

69. *Id.* at 1206 (citation omitted).

70. *Id.*

71. *Id.*

72. *Id.*

73. 432 So.2d 293 (La.App. 4th Cir.1983).

74. *Id.* at 295.

75. *Id.*

76. *Id.*

77. *Id.*

ported the majority opinion, was unable to distinguish the *Legier* case and therefore urged circulation of the majority opinion for *en banc* consideration.[78]

It is clear to us that the cases are not distinguishable. The *Legier* court assumed (whether or not it had the facts) that the monies held had been earned, deducted from the judgment debtor's paychecks, and were being held for distribution to the judgment debtor owed the money. The *Legier* case was not decided upon the policy underlying the child support obligation. The *Legier* court concluded, plainly, that the earnings exemption protected only those earnings generated on a weekly, biweekly or monthly basis, **and paid** according to the same ongoing basis. The *Legier* court had before it sufficient facts to afford it the option of considering the *Latiker* argument that the funds were comprised of earnings deducted from the debtor's pay and held for the debtor, to be distributed later (at the end of the year). We think it did so and rejected the argument.

The *Latiker* court focused upon the source of the money held for the employee (clearly deductions from periodic pay checks, and therefore not properly classified as deferred payment of wages—as the wages had been paid), concluding, essentially, that if the money was traceable to earnings, then the exemption applied. The *Legier* court focused upon the method of payment as referred to in the statute, and could discern no difference between the tax refund (analyzed under the federal version of a similar earnings exemption) whereby money is held for the employee in the event of tax overpayment, and the annual distribution of money to employees of the accrued deductions for prior checks by the vacation funds and wages.

Finally, the case d*e la Vergne v. de la Vergne*,[79] deals with the question whether passive rental income falls within the earnings exemption. In this case the judgment creditor garnished tenants of an apartment complex who owed rent to the judgment debtor. The trial court concluded "that the statutory exemption from seizure of wage earnings was inapplicable to protect passive rental income." [80] On appeal the state circuit court characterizes the debtors' contention to be "that said rental payment[s] constitute earnings which are 75% exempt from seizure pursuant to LSA–R.S. 13:3881." [81] The court found "this argument to be without merit." [82] The debtor argued that the rental payments were tantamount to earnings. "Hughes claims that the Fernwood apartment complex generates approximately $15,000 in revenue monthly. Of this 90% goes to pay the debts of the complex as they come due. He alleges that the net of $1,500 is his only income and therefore, only 25% of it is garnishable." [83] As best we can tell, the debtor was attempting to analogize the obligations of the complex of debt service and operating costs to the required deductions and withholdings referred to in the statute, so as to reach a "disposable earnings" figure to which the statutory exemption could be applied.

We are not clear as to what the *de la Verque* court in fact did. "The court rejects the notion that this is the equivalent of Hughes' weekly earnings as his sole income." [84] Had the court stopped there, we might better understand. However, the court goes on to say that the only proof of the debtor's contention was his self-serving testimony, and that the trial court's finding was factual and was therefore not to be disturbed. "As such, the court finds LSA–R.S. 13:3881 to be inappli-

**78.** *Id.* at 296.

**79.** 662 So.2d 32 (La.App.5th Cir. 1995).

**80.** *Id.*

**81.** *Id.* at 33.

**82.** *Id.*

**83.** *Id.*

**84.** *Id.*

cable in the instant case. That the entire amount is accessible . . . through garnishment." [85]

If the matter was one of fact, then the de la Verque case does not stand for the legal proposition that rental income is not, as a matter of law, excluded from the coverage of the exemption statute, and if the court is to be believed, then its holding is grounded in the failure of the debtor to convince the trial court that the rental income was the debtor's "sole income." The trial court opinion is unpublished, but we think the de la Verque court is, in fact, not to be believed, regarding the purported grounding of its holding. The only reference to the trial court ruling—that the statutory exemption was inapplicable to passive rental income—suggests that the lower court reasoning was legal, that the earnings exemption did not extend to passive rental income.[86]

There are a few other Louisiana cases which we do not discuss here that deal with the exemption statute within the context of the question whether amendments to the statute (which change the exempt portion) are to be applied retroactively (all involve the agreed-upon application of the statute to earnings generated and paid on a weekly, biweekly or monthly basis).[87]

The state appellate court jurisprudence reveals, for the most part, an underlying assumption that the earnings exemption applies to ongoing employment earnings payable according to a periodic pay schedule, for the performance of services. It has embraced the looking beyond payments designated as "salary" so as to include other earnings paid along with the designated "salary" portions, and has employed a backward-looking averaging calculation to determine a periodic payment amount due from and employing corporation that paid the judgment debtor erratically. It has concluded that termination of employment does not deprive a former employee of the right to the exemption over wages owed but not paid to or for the benefit of the former employee. It has suggested that perhaps earnings could be abandoned much like a trade or profession, leaving the earnings without exemption protection much like tools formerly used in the former profession.

It has shown, within the same appellate circuit, both a willingness and an unwillingness to extend the exemption to funds that are traceable to earnings that have been paid to or for the benefit of the debtor and thereafter held for the debtor's account. It is from this intra-circuit conflict that we find the primary support for our conclusion that the term "earnings," as used within § 3881, is not clear and unambiguous.[88]

---

**85.** Id.

**86.** Clearly the supposed factual basis for the court's opinion is no basis at all. The only requirement in the exemption statute is that the earnings subject to exemption be equal to or less than 75% of what the debtor earns by the week (to be figured in this case on a monthly basis). The court does not discuss what other evidence is necessary, and even if the court threw out all deductions from the $15,000, if the debtor's testimony was that the $15,000 was the only gross income, at least 75% of it would be exempt, if the exemption statute was applicable. As we see it, the court's opinion doesn't hold water as one grounded in fact. Only as a resolution of the legal question—Is the exemption statute applicable or not?—does the court's decision make sense.

**87.** See American Finance Corp. of Natchitoches v. Allen, 250 So.2d 775 (La.App. 2nd Cir. 1971); American Finance Corp. of Coushatta v. Small, 250 So.2d 768 (La.App. 2nd Cir. 1971); Excel Baronne Discount, Inc. v. Montana, 279 So.2d 229 (La.App. 4th Cir.1973).

**88.** In saying this we do not fall in line behind the method of determining ambiguity embraced by the Supreme Court in Dewsnup v. Timm, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), if there is disagreement about the meaning of a statute, it is ambiguous. Nor do we embrace the method of ferreting out ambiguity used by the Fifth Circuit in Davis v. Davis, 170 F.3d 475 (5th Cir.1999), a statute is ambiguous because, well, it is. We use this disagreement as highlighting our suggestion that there are two plausible meanings of "earnings," but that the statute will

The one case to face squarely the question of whether the passive income qualified as earnings subject to the exemption holds that it does not, but the basis of the holding is confused.

We glean the following from analysis of state jurisprudence. First, there is no state Supreme Court opinion explicating the scope of the exemption. Second, there is an underlying assumption within the caselaw that the earnings exemption extends to income or compensation for work done or services performed, that is owed on a weekly, biweekly or monthly basis after performance of the service. Third, there is confusion concerning whether earnings paid for the debtor's account into a savings vehicle (or, we guess, held by the IRS pending issuance of a tax refund) are subject to the exemption or whether the exemption is limited to the pay period-by-pay period accruals. Fourth, though there is a holding that the earnings exemption is not applicable to passive income (particularly rents), the basis for the holding is unclear, and, in fact, seems not to be as articulated by the court issuing the opinion. Fifth, none of the courts ask (and therefore none answer) the question whether the meaning of the term "disposable earnings" (and therefore "earnings") is clear and unambiguous, or is susceptible of different meanings (ambiguous).

So, where are we? We think at the place where we must declare whether we understand the statute as clear or must use the tools afforded by the Louisiana Civil Code because the term "earnings" is ambiguous.

■ We conclude that the meaning of "earnings" as the term is used in R.S. § 13:3881(A)(1) is not clear and unambiguous. It embraces at least two meanings (mentioned above). We look therefore to Civil Code Articles 10, 12, and 13, and note here that it appears the Louisiana Supreme Court does not distinguish between language that is susceptible of having different meanings and language that is ambiguous.[89] We need to think further through a more contextual analysis.

## THE PURPOSE OF THE EXEMPTION LAWS; THE CONTEXT OF THE TERM "EARNINGS" WITHIN THE STATUTE AND THE LANGUAGE AS A WHOLE; WE TRY TO ARRIVE AT THE INTENTION OF THE STATE LEGISLATURE

### The Purpose of Legislation

■ We can distill the jurisprudence we have discussed in another opinion[90] regarding the underlying purpose of the Louisiana exemption statutes. The statutes serve to provide a basis for subsistence, so that the debtor will not be destitute and/or become a ward of the state; the statutes are to be interpreted broadly and liberally so that the obvious purpose of the statutes is not frustrated; when by reasonable and fair interpretation an exemption can be maintained, it should be, but because the exemption statutes are in derogation of the general rule of non-exemption, they should be construed as written, with no exemptions being added to embrace a generalized notion of public policy or deleted in favor of the general rule of non-exemption.[91]

mean very different things depending upon which (correct) meaning is used. On one hand, both courts are correct; on the other hand, they can't be.

**89.** *La. Smoked Products v. Savoie's Sausage,* 696 So.2d 1373, 1378 (La.1997). "When the language of a law is susceptible of different meanings, however, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the meaning of am-

biguous words must be sought by examination of the context in which they occur and the text of the law as a whole. *Hutchinson v. Patel,* 637 So.2d 415 (La.1994). *See also,* LA. CIV. CODE ANN. arts. *10 and 12.''*

**90.** *In re Brown,* 189 B.R. 653 (Bankr.M.D.La. 1995), *supra,* n. 40.

**91.** *Id.* at 660 (see cases collected therein).

Against this backdrop we now fold in our analysis of the Louisiana substantive understanding of the cause of action for loss of earnings capacity, to fix it within the context of our active/passive earnings quandary.

### The Future Earnings Cause of Action

■ In Louisiana the claim for future wages is described as the right to indemnification "for decreased earning capacity which is determined by deducting plaintiff's earning ability after the injury from his earning ability immediately prior to the injury rather than by deducting his income after the injury from his income prior to the injury."[92] Because the question is the extent of loss of earnings capacity, the actual income earned before the injury, though it may be relevant evidence of earnings capacity, is not determinative of pre-injury earnings capacity, nor are post-injury earnings determinative.[93] In fact, "[W]hat [the] plaintiff earned before and after the injury does not constitute the measure. Even if he had been unemployed at the time of the injury he is entitled to an award for impairment or diminution of earning power. And while his earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn."[94]

■ The right to claim loss of future earnings capacity, then, is an interest in property that may, in fact, have little relation even to the earnings before the

accident, or to what the plaintiff would actually have earned afterward. "While plaintiff's earning capacity at the time of the accident is relevant, it is not determinative of his future ability to earn. Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury. Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy though he never profited from it monetarily."[95]

■ Therefore, "even a plaintiff who 'has not suffered a loss of income' after an accident 'compared to his earnings prior to the accident' is entitled to compensation if he can prove that his 'ability to earn a living is impaired' by delict."[96]

The claim for loss of earnings capacity, valuable only imprecisely, is a claim for loss of earnings potential, which (conceptually) could even be established in the state courts of Louisiana without proof of any actual earnings before the injury.[97]

■ The claim for loss of future earnings capacity is a recognized component of general damages assertable against a tort feasor under the general tort law of the state.[98] Therefore, an award or settlement

---

**92.** *Coco v. Winston Indus., Inc.,* 341 So.2d 332, 338 (La.1976).

**93.** *Id.; Hobgood v. Aucoin,* 574 So.2d 344 (La.1990); *Folse v. Fakouri,* 371 So.2d 1120 (La.1979); *Pierce v. Milford,* 688 So.2d 1093 (La.App. 3rd Cir.1996).

**94.** *Folse v. Fakouri,* 371 So.2d 1120, 1123 (La.1979); *Batiste v. New Hampshire Ins. Co.,* 657 So.2d 168 (La.App. 3rd Cir.1995).

**95.** *Hobgood v. Aucoin,* 574 So.2d 344, 346 (La.1990).

**96.** *Pierce v. Milford,* 688 So.2d at 1095. *See also, Bernard v. Casualty Reciprocal Exch.,* 534 So.2d 1348, 1357–1358 (La.App. 5th Cir.

1988) ("Earning capacity is not itself determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity.")

**97.** *See, Folse, supra; Bernard v. Casualty Reciprocal Exch.,* 534 So.2d 1348, 1356 (La.App. 5th Cir.1988).

**98.** LSA–C.C. art. 2315 reads as follows:
 **Art. 2315. Liability for acts causing damages**
 Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

of a general damages award, including loss of future earning capacity, is best described as an obligation to pay damages for personal injury caused by fault. As shown, the award is meant to replace the capacity or potential lost through the injury, and under Louisiana law is not meant to correlate to actual loss of actual earnings, is not earnings determined, is not precisely to be seen as a replacement for earnings (certainly is not to be limited by what a plaintiff was earning at the time of the accident, even if the earnings continued). In fact, as shown by our reference to Louisiana law, the loss of earning capacity is only marginally related to an injured person's actual job or actual earnings at the time of the injury, and is to be given whether or not the person had earnings or would ever expect to fulfill the earning capacity to be replaced by the award. In other words, framed along the lines of our inquiry, the award for loss of earnings is designed to replace part of an asset. Because the asset is the person's capacity, which by definition cannot be replaced but by money, the award increases the person's asset base so that the person can, in fact, have the potential, represented by the capacity to earn, fulfilled. Because the award is to replace earning capacity, or potential, without regard to whether the injured person would even have earned the money (fulfilled the potential), and is not to replace actual loss, the award is not to be seen as a substitute for money actually earned for activity actually performed.

The loss of earning capacity award (through judgment or settlement) is properly seen, under the law of Louisiana, then, as a component of a general damages claim under state tort law, which, as we know from *Wischan*, is property of the

bankruptcy estate, rather than a right to claim earnings for services actually performed (which may have little or nothing to do with the earnings potential or capacity of the person doing the earnings) which is not seen as vested under § 541(a)(1) as of commencement of the case.

We now move to consider the proper interpretation of the earnings exemption, both generally (regarding scope—narrow active earnings only—or broad—extending to passive earnings) and specifically (deciding the question of whether the loss of earnings capacity claim (and proceeds therefrom) is exempt).

Because we have determined the word "earnings" as used in § 3881(A)(1) to be either ambiguous or susceptible of two different meanings, we employ the aforementioned Civil Code articles for our interpretation endeavor.[99]

■■■ We are charged with ascertaining the intention of the legislature in passing the statute containing the particular word, "earnings."

> ...The endeavor should be made, by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the legislature, or to discover how the policy of the legislature with reference to the subject matter has been changed or modified from time to time. In other words, in determining the meaning of a particular statute, resort may be had to the established policy of the legislature as disclosed by a general course of legislation.... [100]

As well, it is helpful to examine the legislative history of related legislation, because

---

Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person.
*See also Folse v. Fakouri, supra; Coco v. Winston, supra.*

**99.** Those are articles 10, 12, and 13.

**100.** *Malone v. Cannon,* 215 La. 939, 41 So.2d 837, 843 (1949); *see also, Theriot v. Midland Risk Ins. Co.,* 694 So.2d 184, 186 (La.1997); *Roberts v. City of Baton Rouge,* 108 So.2d 111, 124 (La.1958); *Melancon v. Mizell,* 216 La. 711, 44 So.2d 826 (1950); *State of La. ex rel. A.M.,* 1999 WL 455463 (La.1999).

of article 13 (laws on the same subject matter must be interpreted in reference to each other) and because the legislature is presumed to pass laws "with deliberation and with full knowledge of existing ones on the same subject." [101]

Article 10 of the Civil Code is based upon and supercedes former article 18, Civil Code of 1870, but according to the revision comments (La. Civil Code 1987), "[i]t does not change the law." Old article 18 reads "[t]he universal and most effectual way of discovering the true meaning of law, when its expressions are dubious, is by considering the reason and spirit of it, or the cause which induced the legislature to enact it." Because this principle is incorporated into article 10, if a statute is "dubious" (language is susceptible of two meanings or is ambiguous), ". . . it is our duty to study the conditions which obtained at the time of the passing of the act, in an effort to determine what prompted its enactment, and to use that purpose as a guide in determining the meaning of ambiguous terms." [102]

We have previously concluded that "while [article 13] of the Civil Code was designed primarily as a method of interpreting various Code articles, it is clear that reference to differing types of statutory and Constitutional pronouncements is not prohibited, as all laws *pari materia* are to be considered." [103]

 Laws in *pari materia* are those

. . . which relate to the same person or things, or to the same class of persons or things, or which have a common purpose; and although an act may inciden-

tally refer to the same subject as another act, it is not in pari materia if its scope and aim are distinct and unconnected. It is a well established rule that in the construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although they were enacted at different times, and contain no reference to one another.[104]

Finally, we recall the provisions of article 12, which require that we find the meaning of the ambiguous words by "examining the context in which they occur and the text of the law as a whole."

As we mentioned earlier, the word "earnings," in § 3881 is part of the term "disposable earnings," the definition of which has been previously quoted. There is reference to "disposable earnings for any week," the "federal minimum hourly wage in effect at the time the earnings are payable," and the "employee's pay period." (§ 3881(A)(1)(a)). The definition of "disposable earnings" does refer to "that part of the earnings of any individual." However, while this reference is unlimited as regards the individual, the phraseology does not expressly extend the "any earnings" of "any individual." In fact, "the earnings" is limited by the preceding "that part of," so that "disposable earnings are that part of . . . remaining after the deduction from **those** earnings of any amounts required by law to **and** which amounts are reasonable **and** are being deducted in the usual course of business at the time the

---

**101.** *City of New Orleans v. Board of Supervisors*, 216 La. 116, 43 So.2d 237 (1949); *Theriot v. Midland Risk Ins. Co., supra.*

**102.** *Item Co. v. Nat'l Dyers and Cleaners*, 15 La.App. 108, 130 So. 879, 881 (1930). *See also, Union Sulphur Co. v. Parish of Calcasieu,* 153 La. 857, 96 So. 787, 788 (1923); *State ex rel. City of New Orleans v. New Orleans N.E.R. Co.,* 42 La.Ann. 138, 7 So. 226, 227 (1890).

**103.** *In re Brown*, 189 B.R. at 662 (collecting old cases); *see also, Melancon v. Mizell,* 216 La. 711, 44 So.2d 826, 831 (1950) ("In interpreting a statutory provision it should be construed along with the remainder of the statute and in connection with all laws on the same subject matter.")

**104.** *Malone v. Cannon,* 41 So.2d at 843, *citing* 59 Corpus Juris, *verbo* Statutes, Section 620.

garnishment is served upon **the employer . . . .**"

While the conjunctive phraseology ("and") combined with the use of "those" perhaps does not require that only those earnings that have deductions both required by law and taken (as required by law) are covered by the exemption, there is the apparent restriction imposed by reference to service of the garnishment "upon the employer." From reference only to the definition of "disposable earnings," then, a plausible argument can be made that while there is no requirement that the earnings be such that deductions are required by law **and** made, the disposable earnings are limited to **earnings from an employer,** and therefore to active earnings from an employer for services actually performed.

From the history of § 3881 and related statutes, we glean the reason for this apparent restriction of the garnishment universe. This history begins in 1825 with the promulgation of the Louisiana Civil Code and Code of Practice. Code of Practice article 644 set forth those items that were exempt from seizure, namely, the debtor's linen and clothes, bed, arms and military accouterments, and tools and instruments of the trade.[105] Code of Practice article 647 stated that, in the absence of real property, moveable property, or slaves, the creditor could seize any sums due the debtor but for alimony and the salary of officers (the french text makes it clear that this is meant to be "public officer"). Civil Code article 1987 further protected "money due for the salary of an office [public office], wages, or recompense for personal services." To the extent, however, that Civil Code article 1987 conflicted with Code of Practice article 647, the Practice Code article prevailed.[106] This was the state of the law until 1852. Act 324 of that year amended Code of Practice article 644 to provide broad protection for "wages" and "compensation earned and due within the last 31 days prior to the court action to an amount sufficient for the necessary support of the family." This protection was excepted for "alimony, furnished to the debtor or his family," and for rent. This Act, however, was repealed in its entirety, by Act 206 of 1853. After the repeal, Code of Practice article 644 was without a wage exemption [107] until Act 39 of 1872 afforded protection to "money due the salary of an officer," "wages," and "recompense for personal services." The purpose of this amendment was to square Code of Practice article 644 with Civil Code article 1987 (renumbered in 1870 as 1992). In Act 79 of 1876 the wage exemption was greatly narrowed to "laborer's wages."

It is apparent that prior to 1932, only the already-earned earnings of certain debtors were subject to garnishment. The general garnishment statutes were contained within various articles of the Louisiana Code of Practice (articles 246–264 and 642), along with certain Revised Statutes (13:3471(10), 3911), and could not be utilized to obtain garnishment of earnings not yet earned.[108]

By Act 115 of 1928, the Louisiana legislature attempted to extend the remedy of garnishment to include unearned or future earnings, but because the title to legislation did not announce this extension of creditor rights, the act was declared unconstitutional.[109] As discussed above, the

---

**105.** According to the *Projet* of the Louisiana Code of Practice, these exemptions derive from the Curia Philipica.

**106.** *See, James Vance v. Antoine Lafferanderie, et al.,* 4 R. 340 (La.1843) and Article X of April 12, 1824 Statute enacting the Civil Code of 1825.

**107.** *See, Louisiana Code of Practice,* 1866, 1869, 1870, and 1871.

**108.** *Humphrey v. Midkiff,* 122 La. 939, 48 So. 331 (1909); *Hooter v. Wilson,* 273 So.2d 516, 518–519 (La.1973).

**109.** *Surety Credit Co. v. Tieman,* 171 La. 581, 131 So. 678 (1930); *see also Hooter v. Wilson* 273 So.2d at 519.

prior "earnings" exemptions were structured so that "the wages of laborers were wholly exempt from seizure, while the salaries of other employees, except public officials, were subject to seizure."[110] The statute sought to broaden the scope of wages subject to seizure to include most categories of laborers, subject to an exemption over part of earnings, and at the same time to broaden the applicability of the exemption so that a portion of non-laborer salaries would be exempt.[111]

Thereafter, by Act 181 of 1932, which enacted La. R.S. 13:3921–3926, a separate set of garnishment statutes was passed, providing for the seizure of both earned and unearned wages and salaries, by a single garnishment. This set of garnishment statutes was set out separately from the general sections providing for execution of judgments by garnishment, and was specifically designated for use as the means to execute (by garnishment) upon wages and salaries. A corresponding exemption provision was passed by Act 183 of 1932, which amended Article 644 of the Louisiana Code of Practice and instituted an exemption for wages which, by Act 181, had become subject to seizure as they became due. The exemption protected 80% of earnings with a minimum of no less than $60.00 per month.[112] Clearly, the earnings made subject to the exemption, by Act 183 of 1932, were limited to active earnings, the intention of the legislature having been to enact an exemption which corresponded to the broadened seizure rights enacted through the new garnishment provisions.

In 1960, by Act 32 § 6 of 1960, the Louisiana legislature enacted La. R.S. 13:3881, the present statute containing the earnings exemptions, to update Article 644 of the Code of Practice which was repealed, effective January 1, 1961. As of January 1, 1961, the earnings exception, due to an amendment by Acts 1961, No. 25 § 1 (which curiously was deemed effective as of January 1, 1961, and which raised the minimum exemption to $100.00 per month from $60.00 per month), read: "Eighty per cent of the wages, salary, commissions, or other compensation earned by him, but in no case shall this exemption be less than one hundred dollars monthly."

Subsequently, in 1968, the United States Congress enacted 15 USCA § 1671, et seq. Section 1671 contained findings, including "[t]he unrestricted garnishment of compensation due for personal services encourages the making of predatory extensions of credit . . . .," and "[t]he application of garnishment as a creditors' remedy frequently results in loss of employment by the debtor, . . ." and that "[t]he great disparities among the laws of the several States relating to garnishment have, in effect, destroyed the uniformity of the bankruptcy laws and frustrated the purposes thereof in many areas of the country." Upon these findings Congress promulgated a restriction, applicable to all

---

110. *Surety Credit Co. v. Tieman*, 131 So. at 679.

111. *See*, Section 1. Be it enacted by the Legislature of Louisiana, that one-half of the wages or salaries of all laborers, wage earners, artisans, mechanics, engineers, firemen, carpenters, bricklayers, secretaries, bookkeepers, clerks, or of employees, of any kind or nature whatever, whether skilled or unskilled, whose rate of compensation does not exceed Two Hundred Fifty ($250.00) Dollars [sic] per month, is hereby declared to be exempt from seizure or garnishment. . . . in every case not less than Seventy Five ($75.00) Dollars per month shall be entirely exempt from seizure and garnishment.

112. Act 183 of 1932 read as follows: "In the case of all other laborers, wage earners, artisans, mechanics, engineers, firemen, carpenters, brick-layers, secretaries, bookkeepers, clerks, employees on a commission basis, or employees of any nature or kind whatever, whether skilled or unskilled, 80% of the wage, salary, commission or other compensation thereof can not be seized or garnisheed, but only 20% of such compensation shall be subject to such seizure or garnishment, and in no case shall the seizure or garnishment infringe upon a minimum of sixty ($60.00) dollars per month of such salary, wage, commission or other compensation, which said sixty ($60.00) dollars per month shall always be exempt."

states, upon the amount of "aggregate disposable earnings of an individual for any work week," so that garnishment could not exceed: "(1) 25 per centum of his disposable earnings for that week, or (2) the amount by which his disposable earnings for that week exceed 30 times the Federal minimum hourly wage prescribed by 206(a)(1) of Title 29 in effect at the time the earnings are payable, whichever is less. . . ." [113]

The applicability of the statute to the states was accomplished through § 1673(c),[114] § 1675,[115] § 1676,[116] and § 1677.[117] Probably because of the number of states affected by the new law, section 504(c) of Public Law 90–321 provided that the effective date of 15 USCA § 1671, et seq. was July 1, 1970. The definitions section of § 1671, et seq., found at § 1672, defined "earnings" and "disposable earnings" as follows:

## § 1672. Definitions

For the purpose of this subchapter:

(a) The term "earnings" means compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program.

(b) The term "disposable earnings" means that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by law to be withheld.

\* \* \*

As of the promulgation of 15 USCA § 1671 et seq., the Louisiana earnings exemption (§ 3881(A)(1)) still reflected the 1961 amendment and read: "Eighty per cent of the wages, salary, commissions, or other compensation earned by him, but in no case shall this exemption be less than one hundred dollars monthly." By Act 242 of 1970, which became effective (after emergency certification) on July 2, 1970, § 3881 was amended to read as follows:

The following income or property of a debtor is exempt from seizure under any writ, mandate, or process whatsoever:

(1) Seventy-five per centum of his disposable earnings for any week, or the amount by which his disposable earnings for that week exceed thirty times the Federal Minimum Hourly Wage prescribed by Section 6(a)(1) Fair Labor Standards Act of 1938 in effect at the time the earnings are payable but in no

---

**113.** 15 USCA § 1673.

**114.** Section 1673(c), after a couple of immaterial amendments, now reads as follows:

(c) **Execution or enforcement of garnishment order or process prohibited**
No court of the United States or any State, and no State (or officer or agency thereof), may make, execute, or enforce any order or process in violation of this section.

**115.** Section 1675, after a couple of non-material amendments since its adoption, now reads as follows:

§ 1675. **Exemption for State-regulated garnishments**
The Secretary of Labor may be regulation exempt from the provisions of section 1673(a) and (b)(2) of this title garnishments issued under the laws of any State if he determines that the laws of that State provide restrictions on garnishment which are substantially similar to those provided in section 1673(a) and (b)(2) of this title.

**116.** Section 1676, which has not been amended, reads as follows:

§ 1676. **Enforcement by Secretary of Labor**
The Secretary of Labor, acting through the Wage and Hour Division of the Department of Labor, shall enforce the provisions of this subchapter.

**117.** Section 1677, which has not been amended, reads as follows:

§ 1677. **Effect on State laws**
This subchapter does not annul, alter, or affect, or exempt any person from complying with, the laws of any State
(1) prohibiting garnishments or providing for more limited garnishment that are allowed under this subchapter, or
(2) prohibiting the discharge of any employee by reason of the fact that his earnings have been subjected to garnishment for more than one indebtedness.

case shall this exemption be less than at the rate of seventy dollars per week of disposable earnings or a multiple or fraction thereof according to whether the employee's pay period is greater or lesser than one week. The term "disposable earnings" means that part of the earnings of any individual remaining after the deduction from those earnings required by law to be withheld.

Therefore, though the percentage of income covered by the earnings exemption decreased (from 80% to 75%), the minimum amount subject to the exemption increased from $100 per month to $70.00 per week. According to the Louisiana Supreme Court:

> It is obvious that the Louisiana legislation increasing the wage exemption from seizure (Act 242 of 1970, which was certified as emergency legislation and became effective July 2, 1970) was state remedial legislation in response to, and in compliance with, the congressional mandate. Clearly this state hoped to acquire approval from the United States Department of Labor to enforce its provision and thus eliminate federal administrative invasion in this field.[118]

This observation of the Louisiana Supreme Court is clearly borne out by the language used by the legislature in the 1970 Act. The earnings exemption does not define "earnings," but exempts "disposable earnings," by use of that term for the first time. The definition of "disposable earnings" is copied verbatim from § 1672(b), which relates back to the Federal statute definition of "earnings" as "compensation paid or payable for **personal services** ..."

It is clear to this Court that the advent of garnishment statutes such as that brought about by Act 181 of 1932, which specifically dealt with active earnings yet due from an employer, began the political road to the promulgation by the 1968 Congress of 15 USCA § 1671 et seq. The precursors to the post–1970 version of § 3881 were clearly limited to active earnings such as were susceptible of garnishment pursuant to the specific garnishment provisions of § 13:3921, et seq.[119]

Conforming to the directive of state law on statutory interpretation, we conclude, preliminarily, as follows.

First, the modern earnings exemption era began with the legislative move to expanded creditor rights. Once it was determined to expand execution of judgment rights to include the right to seizure of unearned and future income of a judgment debtor, through the use of a specific set of garnishment statutes limited in applicability to wages and salaries (and commissions), the Louisiana legislature deemed it necessary to enact a corresponding exemption provision that was designed to make the earnings exemption generally applicable, so that all types of workers would be covered. Because of wording and because it was a provision corresponding to the expanded garnishment provisions, it is clear to this Court that the 1932 version of Article 644 was designed to apply only to active earnings.

Second, the second phase of the modern earnings exemption began in 1970, when the Louisiana legislature enacted the amendment to § 3881, in response to (with the amendment effective the very day after the effective date of) the Consumer Credit Protection Law promulgated by Congress. The amount of earnings subject to the earnings exemption tracked the Federal law, as did (word-for-word) the definition of "disposable earnings." The 1970 amendment had the effect of raising the minimum dollar amount of exempt earnings some 200% (from $100 per month to $70 per week). The Federal statute

---

118. *Hooter v. Wilson*, 273 So.2d at 519.

119. One thing we have not mentioned is the placement of the exemption statute right before the specific garnishment section which

requires, among other things, that a judgment issue determining the exempt amount of earnings so as to set the garnishment limit.

contains a definition of earnings which makes clear that "disposable earnings" relates only to earnings for personal services. The Louisiana statute does not carve out a separate definition of "earnings," but we conclude it was unnecessary given the prior law limitation to active earnings. The fact that the "disposable earnings" definition is the same as found within the Federal statute leads us to conclude that in changing to the term "disposable earnings" the Louisiana legislature meant the term to mean the same thing as it meant within the Federal statute— keyed to and limited by the definition of "earnings" within the Federal statute.

In support of this conclusion, we point out that to comply with the Federal mandate, the amendment had to increase the exempt portion of earnings by some 200 percent, that the legislature enacted the amendment as an emergency measure (some two years after Congress promulgated the Consumer Credit Protection Law), and that the effective date of the Louisiana amendment was the first day after the effective date of the Federal statute. It is unreasonable to think it possible that the Louisiana legislature had in mind the expansion of the exemption statute far beyond anything contemplated by the Federal law, by opening up the property exempt under the statute, through use of the term "disposable earnings" to include property never before exempt (passive earnings) though there was no impetus to do so.

The language of the first phase of the modern version of the earnings exemption, then, was to provide a companion provision for the newly vested seizure rights. The cause of the second wave was the Federal statute which itself was clearly limited to active earnings. We think that the history of the legislation, which has revealed these prompting developments, establishes that the use of "disposable earnings" was intended by the Louisiana legislature to refer and be limited to active earnings, or earnings for services performed for compensation.

Our analysis of the present wording of the statute in light of the foregoing shows us that our initial focus upon the phrase "at the time the garnishment is **served upon the employer**" was correct, that the reference to **the employer** is a limiting reference. The reason the definition of "disposable earnings" now includes the language concerning the employer, we now see, is that the earnings exemption was always designed to accompany the specific garnishment provisions of La. R.S. 13:3921 et seq., the use of which is limited to seizure of wages, salaries, and commissions (each of which is a different type of earnings), all of which require the existence of an employer of some type because the garnishment provisions are limited in applicability to employees ("laborer, wage earner, artisan, mechanic, engineer, fireman, carpenter, bricklayer, secretary, bookkeeper, clerk, employee on a commission basis, or employee of any nature and kind whatever, whether skilled or unskilled. . . .").[120]

Before finishing this thought, we acknowledge that we are on the brink of rather far-ranging dicta, to the effect that the earnings exemption does not extend to the earnings of the self-employed, as there would be no employer upon whom to serve the garnishment (the garnishment would have to be served upon the party in whose hands the property was located). However, we need not go there. Our analysis is performed for the purpose of answering whether the earnings exemption extends to passive earnings, or, put another way, to proceeds forming part of an income stream of an asset or investment or representing the liquidation of an asset (such as a cause of action). We do not, therefore, address the question whether there are types of

---

120. La. R.S. 13:3921(A). Property owed or belonging to another is subject to garnishment by use of the general garnishment provisions of the Louisiana Code of Civil Procedure, Articles 2411, et seq., which contain no reference to exemptions.

active earnings for the performance of services (such as the self-employed professional, independent contractor, etc.) not covered by the earnings exemption. There are no Louisiana cases dealing with this issue, and if we are going to be the first, it will not be until the issue needs resolving within a particular case or controversy.[121]

■ Where we will go is as far as stating that the legislative history of the Louisiana exemption statute, as well as the garnishment and Federal Consumer Credit Protection laws convinces us, at least at this stage, that the earnings exemption is limited to active earnings owed to the debtor or that may become owed in the future, for personal services rendered.

We think that in addition to playing a specific and material part of the legislative history of § 3881 (and the cause of its enactment), the Federal Consumer Credit Protection law is clearly a law in *pari materia* with § 3881,[122] as it relates to the same subject and has an identical scope and effect (not to mention identical definitional language). As such, we can look to jurisprudence interpreting the Federal law for guidance (as opposed to authority). In fact, as mentioned in our discussion of *Legier v. Legier, supra,* there is a U.S. Supreme Court opinion dealing with 15 USCA §§ 1672 and 1673.

In *Kokoszka v. Belford,*[123] the Supreme Court faced the question of whether a Federal income tax refund, arising from withholding prior to the taxpayer/debtor's bankruptcy case, was property of the bankruptcy estate or whether at least 75% of it was exempt, pursuant to 15 USCA §§ 1672 and 1673.[124]

The debtor argued that the tax refund, though grounded in pre-bankruptcy wage withholding, was traceable to wages and therefore necessary to the debtor's fresh start. Though denied specifically for wages, however, the court, citing the appeals court below, concluded

> . . . since a 'tax refund is not the weekly or other periodic income required by a wage earner for his basic support, to deprive him of it will not hinder his ability to make a fresh start unhampered by the pressure of preexisting debt,' 2 Cir., [*In re Kokoszka],* 479 F.2d [990], at 995 [(2nd Cir.1973)] 'Just because some property interest had its source in wages . . . does not give it special protection, for to do so would exempt from the bankrupt estate most of the property owned by many bankrupts, such as savings accounts and automobiles which had their origin in wages.' *Ibid.*[125]

Because the court found the tax refund rooted in the bankruptcy past and therefore property, it remained necessary to address the debtor's claim of exemption under 15 USCA § 1671 et seq. The court framed the debtor's argument as follows:

> . . . Petitioner argues that the Consumer Credit Protection Act's restrictions on garnishment, 15 U.S.C. § 1671 et seq., are such an exemption. In essence, the petitioner's position is that a tax refund,

---

121. For a recent case dealing with this issue, within the context of the exemption statutes of Nebraska, *see In re Pruss*, 235 B.R. 430 (8th Cir. BAP Neb. (1999)), which contains a lively back-and-forth between majority and dissent, and a substantial collection of cases.

122. *See Malone v. Cannon,* 41 So.2d at 843.

123. 417 U.S. 642, 94 S.Ct. 2431 (1974).

124. The question was so framed because the Bankruptcy Act section then in effect, § 70(a)(5) (11 USCA § 110(a)(5)), provided

that exempt property never passed to the bankruptcy trustee, who held title to all bankruptcy estate property. The structure of the Code is now different, as all legal and equitable interests of the debtor as of the commencement of the case (unless specifically excluded) became property of the estate, subject to a debtor's right to carve exempt property from the estate by claiming exemption. 11 U.S.C. § 541(a)(1); 522(b), Federal Rule of Bankruptcy Procedure 4003.

125. *Kokoszka v. Belford,* 417 U.S. at 648, 94 S.Ct. 2431.

having its source in wages and being completely available to the taxpayer upon its return without any further deduction, is 'disposable earnings' within the meaning of the statute. 15 U.S.C. § 1672(b). He further argues that the taking of custody by the trustee is a 'garnishment' since a bankruptcy proceeding is a 'legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt.'[126]

After reviewing the history and cause of the Consumer Credit Protection Law, the court agreed with the appeals court that the restriction on garnishment contained therein was not applicable to the tax refund.

> The Court of Appeals held that the terms 'earnings' and 'disposable earnings,' as used in 15 U.S.C. §§ 1672, 1673, did not include a tax refund, but were limited to 'periodic payments of compensation and (do) not pertain to every asset that is traceable in some way to such compensation.' 2nd Cir., 479 F.2d, at 997. This view is fully supported by the legislative history. There is every indication that Congress, in an effort to avoid the necessity of bankruptcy, sought to regulate garnishment in its usual sense as a levy on periodic payments of compensation needed to support the wage earner and his family on a week-to-week, month-to-month basis. There is no indication, however, that Congress intended drastically to alter the delicate balance of a debtor's protections and obligations during the bankruptcy procedure. We therefore agree with the Court of Appeals that the Consumer Credit Protection Act does not restrict the right of the trustee to treat the income tax refund as property of the bankrupt's estate....[127]

In another Federal case, *Usery v. First National Bank of Arizona*,[128] the court, in an opinion by now Justice Kennedy, dealt with a claim of exemption brought on behalf of a judgment debtor by the United States through the Secretary of Labor. The Secretary requested injunctive relief, directed at a garnishee bank, requiring the bank to comply with the Consumer Protection Credit Law garnishment limitation in response to garnishment of a depositor's checking account.

The bank argued that the Federal law did not apply to the garnishee bank, but was limited to employers. Recognizing that the statute is not expressly limited to employers/garnishers, the court concludes

> An interpretation of the Act which limits its application to employers (or those who stand in the position of employers by virtue of paying or owing compensation for services to the individual debtor) is consistent with the congressional purposes evident on the face of the Act and from the legislative history....
>
> The definition of earnings as compensation "paid or payable" in section 302(a) is not inconsistent with this view, and is quite consistent with an interpretation that confines the duty to apply the exemption exclusively to the employer or those in the position of the employer. The term "paid" as applied to the employer will cover those amounts which have been accrued on the employer's books, and thus are "paid" in the accounting sense, even though such funds have not yet been transmitted to the employee. This construction is an adequate explanation for the use of the terms "paid or payable." ...[129]

Finally, citing *Kokoszka*, the Ninth Circuit points out that

> The Court found that Congress' purpose in enacting the statute was, "to regulate garnishment in its usual sense as a levy

---

**126.** *Id.* at 649, 94 S.Ct. 2431.

**127.** *Id.* at 651–652, 94 S.Ct. 2431 (footnote deleted).

**128.** 586 F.2d 107 (9th Cir.1978).

**129.** *Id.* at 110.

on periodic payments of compensation needed to support the wage earner and his family on a week-to-week, month-to-month basis." ... [130]

and that

Like a lump sum tax return, a bank account has neither an element of periodicity nor the critical relationship to a person's subsistence that a paycheck does. We think that the rationale of Kokoszka supports the result here.[131]

In the case *Wallerstedt v. Sosne,*[132] the court determined that under the Missouri exemption statute a state tax refund did not constitute earnings covered by that state's earnings exemption.[133] Though it recognized that it was dealing with a question of state law (a claim of exemption under state law in a Missouri bankruptcy case), the court uses *Kokoszka* as persuasive authority.

Although the Supreme Court addressed the issue under the federal exemption scheme and in light of a federal garnishment statute, we are convinced that the same reasoning should apply to the Wallerstedts' claim for exemption under the Missouri garnishment statute. We acknowledge that no Missouri authority exists on this question of state law and we have no legislative history to guide us in interpreting section 525.030(2). Nonetheless, we believe that Missouri courts would find persuasive these decisions applying federal law to a quite similar issue. We thus hold that the Wallerstedts' 1988 tax refunds are not earnings, and cannot be exempted from the bankruptcy estate under the Missouri garnishment statute.[134]

■ We are in the same position, we think, as the Eighth Circuit in *Wallerstedt* (except that we do have good legislative history); we can use the analysis of Federal courts law in our effort to interpret state law. We are not bound by the Supreme Court authority here, but due to the interrelationship between Louisiana's earnings exemption and 15 USCA §§ 1672 and 1673, we see the analysis as persuasive.[135]

130. *Id.*

131. *Id.*

132. 930 F.2d 630 (8th Cir.1991).

133. The Missouri statute at issue read much like Louisiana's § 3881:
 2. The maximum part of the aggregate earnings of any individual for any workweek, after the deduction from those earnings of any amounts required by law to be withheld, which is subjected to garnishment may not exceed (a) twenty-five percentum, or (b) the amount by which his aggregate earnings for that week, after the deduction from those earnings of any amounts required to be withheld by law, exceed thirty times the federal minimum hourly wage prescribed by section 6(a)(1) of the Fair Labor Standards Act of 1938 in effect at the time the earnings are payable, or (c) if the employee is the head of a family and a resident of this state, ten percentum, whichever is less....

134. 930 F.2d at 632 (citation omitted).

135. Of course, as a low-rung federal court we are bound by the analysis of federal law. We take the opportunity here to argue that based upon our analysis of the case law interpreting §§ 1672 and 1673, the *Legier v. Legier* court was correct, and the *Latiker* court was incorrect. The problem not recognized by the *Latiker* court is that the funds being garnished were comprised of money already paid to the debtor, and held for his account. The funds were not accrued but unpaid vacation, or accrued but unpaid salary or overtime. The analytical problem inherent in the *Latiker* court is the absence of limiting principal, as there is no way the court can rationally delineate among those assets traceable to wages that are exempt from those that are traceable to wages but are not exempt. The wages have been paid, the wages are cash, an asset held by the debtor for his account. Therefore, the fund in which the asset is placed must be otherwise exempt for the proceeds or payments owed to the debtor to be exempt. Once the earnings become cash, or something purchased with cash, the cash, income produced by it, or thing bought with it has ceased to be "disposable earnings" under Louisiana law. The Louisiana Fourth Circuit cases are not distinguishable. *Legier v. Legier* is correct.

We conclude that use of the *pari materia* Federal law bolsters our interpretation of § 3881 as applicable only to active earnings.

We finish this portion of our analysis by discussing the earnings exemption within the context of the overall exemption scheme. We suggest that under the Louisiana exemption scheme, if the investment itself is not exempt, seizure of the investment would preclude the future receipt of earnings thereupon. We think the earnings exemption rests upon the proposition that though the debtor might lose all non-exempt assets or property (even that producing earnings), various constitutional prohibitions preclude the seizure of the judgment debtor himself (so as to have the debt worked off through indentured servitude or paid off through a slave sale of the debtor), and therefore that earnings might continue through the performance by the debtor of a job. This assumption has led the Louisiana Legislature to limit the extent to which a debtor's actual occupation can be made to be done purely for a debtor's creditors. Two reasons, it seems: (1) people have to eat; (2) people will not continue to work only for their creditors (especially if them and theirs get no money for food).

Louisiana law can and has determined that certain assets and earnings therefrom are exempt. We note a few of these (but will not set them out in full because we are trying our best to be more effective by writing shorter opinions).

La. R.S. 22:647 exempts annuity contracts and payments and life insurance policies, proceeds and cash value, subject to certain restrictions.

La. R.S. 22:33 exempts IRA account contributions "to the extent that contributions thereto were exempt from federal taxation at the time of contribution, plus interest and dividends that have accrued

thereon." The section also exempts gratuitous payments made by employers and purports to exempt retirement plans (this may be preempted by ERISA). One interesting note about this exemption provision is that it has been construed, regarding IRA contributions, to exempt only the contributions, plus interest and dividends; the capital appreciation on gains from sale of assets, within such an account (or increase in value due to capital appreciation) has been held by one Louisiana court not to be exempt.[136]

La. R.S. 20:1 contains the state homestead exemption.

The exemption of assets carries with it an exemption of the earnings, proceeds, etc. as designated by the statute providing the exemption. As we see, there are numerous asset/proceeds exemptions, many of which could in some manner cover passive earnings or at least proceeds from the liquidation of the exempt asset. We note that the tenor of these proceeds/earnings exemptions is usually subject to some limitation, and as interpreted by at least the one state court which has dealt with the IRA account, the proceeds/earnings exemptions are, if anything, strictly construed. From these other statutes, and the other sections of § 3881, we conclude that the earnings exemption does not extend to passive earnings/proceeds. The Louisiana legislature has enacted several such statutes, and it is not conceivable that by the definition of "disposable earnings" used in § 3881 it sought to extend the term to an unlimited range of earnings/proceeds producing assets.

We need to fold an analysis of the cause of action for loss of earnings capacity into the mix. As we have seen, the cause of action is property and is not meant to be measured by or replace actual earnings loss. It, simply, is not earnings determined. It is a cause of action for damages

---

**136.** *Insurance Assocs., Inc. v. Francis Camel Const., Inc.,* 673 So.2d 687 (La.App. 1st Cir. 1996).

arising out of tort (or, in Louisiana parlance, delict).

A couple of things first. Recall the definition of disposable earnings in § 3881, and the references to amounts by law to be and that are actually withheld. We think it clear that the withholdings referred to at least include federal and state tax withholdings. Recovery for loss of earnings capacity, as an item of general damages for personal injury claims are treated differently from taxable earnings, on both the federal and state level.

Section 104(a)(2) of the Internal Revenue Code exempts from (taxable) gross income "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness." Likewise, La. R.S. 47: § 46 provides that "[g]ross income does not include: ... (2) the amounts of any damages received (whether by suit or agreement) on account of personal injuries or sickness." The component of Louisiana general tort damages that is loss of earnings capacity, then, is different in nature from the earnings comprising "disposable earnings" as described within § 3881.

Louisiana law makes reference to the cause of action for personal injury damages (which would include the loss of earnings capacity component) in places other than the tort law provisions. In the section of the Louisiana Civil Code, Book III, Title VI, Matrimonial Regimes, express reference is made to tort claims and damage within Article 2344, which reads as follows:

**Art. 2344. Offenses and quasi-offences; damages as community or separate property**

Damages due to personal injuries sustained during the existence of the community by a spouse are separate property.

Nevertheless, the portion of the damages attributable to expenses incurred by the community as a result of the injury, or in compensation of the loss of community earnings, is community property. If the community regime is terminated otherwise than by the death of the injured spouse, the portion of the damages attributable to the loss of earnings that would have accrued after termination of the community property regime is the separate property of the injured spouse.

Notice the reference to "loss of earnings." The cause of action and the damages due are property. As such, without an express exemption, the property stands for debt during the community property regime and after termination of the community, including claims for reimbursement [137] between the spouses.

The cause of action for damages, to the extent it is community property, is owned by the two spouses after the termination of the community,[138] each owning an undivided one-half interest in the asset of the former community.[139]

From the Civil Code articles we glean that the Louisiana state law has considered the cause of action for loss of earnings capacity significantly, within the context of the community property regime, and has delineated the property characteristics in a very detailed manner—as an item of property, an asset, subject to undivided co-ownership, mentioned as property within the statutory construct describing what types of assets stand for what types of debt.

The mention of the cause of action within the community property articles supports our understanding of the asset as more akin to an asset that produces passive earnings (actually, more like principal repayment than "earnings") than active earnings from services performed.

---

137. LA. CIV. CODE ANN. art 2345.

138. *See, for example,* LA. CIV. CODE ANN. arts. 2357, 2358, 2358.1, 2359, 2364, 2364.1, and 2365.

139. LA. CIV. CODE ANN. art. 2369.2.

Finally (we think), we go back to a version of the *pari materia* analysis. As a result of our discussion we are satisfied that the loss of earnings capacity component of the tort action is not "disposable earnings" as defined within § 3881. The final brick for our chimney is the suggestion that because of the nature of the asset and our analysis of the legislative history of the earnings exemption, the Louisiana legislature, had it intended to exempt the asset, would have done so by means of an exemption of at least a portion of the tort claim itself. We suggest this because, Congress, with § 522(a)(11)(E) of the Bankruptcy Code, and at least 26 other states have enacted some version of an exemption covering personal injury causes of action and/or damages on proceeds therefrom. We know that the Louisiana legislature is presumed to do its work mindful of the laws on the same subject matter as its own enactments (see above discussion). Though we will not relate the enactment dates of all *in pari materia* statutes, we note that the Louisiana legislature, since the 1970 enactment of the statute in response to the Consumer Credit Protection Law, has amended § 3881 some seventeen (17) times, without adding or even referring to the need for an exemption of tort causes of action and proceeds therefrom. Our interpretation of the earnings exemption is bolstered by reference to the existence of numerous examples of statutes exempting all or portions of personal injury causes of action, none of which has the Louisiana legislature seen fit to utilize as a model, though easy it would be. We mention them, in paraphrase (indebted tremendously to the collection of states' exemption statutes in *Collier's*).[140]

## Alaska:

### Claims for Negligence or Tortious Conduct

Funds to pay medical expenses are completely exempt; other proceeds or rights are exempt to the extent wages are exempt.

Alaska Stat. §§ 09.38.015, .030 and .050

## California:

### Claims for Negligence and Tortious Conduct

A cause of action for personal injury or wrongful death is exempt; an award arising out of personal injury or wrongful death is exempt to the extent necessary for support of dependents except from a claim based on the providing of health care for the injury for which the award was made; if an award or settlement is payable periodically, the amount of such payments that may be applied to satisfy a judgment is that which may be withheld from a like amount of earnings under way garnishment law.

Cal.Civ.Proc.Code §§ 704.140 and .150

## Colorado:

### Miscellaneous Benefits

$5,000 worth of life insurance proceeds; proceeds from the loss, damage, or destruction of exempt property to the extent of such exemption; compensation for personal injury; property subject to judgment for failure to pay state income tax on benefits from a pension or other retirement plan.

Colo.Rev.Stat. §§ 13–54–102(1)(*l*), (m), (n) and (t)

## Georgia:

### Claims for Negligence or Tortious Conduct

Debtor may exempt compensation for wrongful death to the extent necessary for support; loss of future earnings to the extent necessary for support; and up to $7,500 in personal injury payments.

---

**140.** 15 LAWRENCE P. KING, ET AL., COLLIER ON BANKRUPTCY (15th Ed.1999).

Ga.Code Ann. §§ 44–13–100(11)(B), (C), (D) and (E)

### Idaho:

#### Claims for Negligence or Tortious Conduct

Debtor may exempt wrongful death and bodily injury payments to the extent necessary for support as long as the funds are not commingled.

Idaho Code § 11–604(1)(c)

### Illinois:

#### Claims for Negligence or Tortious Conduct

Debtor may exempt a payment on account of the wrongful death of an individual of whom the debtor was a dependent and up to $7,500 compensation for a personal bodily injury of the debtor or of a person on whom the debtor was dependent; the right to receive such an award is exempt for up to two years after is accrues; funds traceable to such an award are exempt for five years after accrual.

735 I.L.C.S. 5/12–1001

### Kentucky:

#### Claims for Negligence or Tortious Conduct

Any debtor may exempt, to the extent reasonably necessary for support, compensation for loss of future earnings of the debtor, or for the wrongful death or loss of earnings of someone on whom the debtor was dependent. A payment up to $7,500 on account of personal injury of the debtor or of someone on whom the debtor was dependent is exempt, but compensation for pain and suffering or compensation for pecuniary loss is excluded from the exemption. All basic motor vehicle reparations benefits plus added reparations benefits for medical expenses are also exempt.

Ky.Rev.Stat. Ann. §§ 304.39–260, 427.150(2)(b), (c) and (d)

### Maine:

#### Claims for Negligence or Tortious Conduct

Debtor may exempt wrongful death or compensation for loss of future earnings to the extent necessary for support; not to exceed $12,500 for bodily injury not including pain and suffering or pecuniary compensation.

Me.Rev.Stat. Ann. tit. 14, §§ 4422(14)(B), (D) and (E)

### Maryland:

#### Miscellaneous Benefits

Debtor may exempt money payable in the event of sickness, accident, injury or death of any person, including loss of future earnings, including but not limited to judgments, arbitrations, compromises, insurance, benefits, compensation and relief; disability income is not exempt from judgment debt for necessities contracted for after disability is incurred.

Md. Cts. & Jud. Proc.Code Ann. § 11–504(b)(2)

### Minnesota:

#### Claims for Negligence and Tortious Conduct

Debtor may exempt rights of action for injuries to debtor or relative, whether or not resulting in death, and claims or judgments arising from damage to, execution upon, or wrongful taking of exempt personal property.

Minn.Stat. Ann. §§ 550.37(9), (16) and (22)

### Mississippi:

#### Claims for Negligence and Tortious Conduct

Debtor may exempt up to $10,000 in proceeds of a judgment for personal injuries.

Miss.Code Ann. § 85–3–17

### Missouri:

#### Claims for Negligence or Tortious Conduct

Debtor may exempt, to the extent necessary for support, the right to receive, or

property that is traceable to, a payment on account of the wrongful death of an individual of whom the debtor was a dependent.

Mo. Ann. Stat. § 513.430(11)

*Nebraska:*

### Claims for Negligence or Tortious Conduct

Proceeds of structured settlement providing periodic payments for personal injuries are exempt.

Neb.Rev.Stat. § 25-1563.02

*New York:*

### Claims for Negligence and Tortious Conduct

Debtor may exempt: (a) a payment on account of wrongful death to the extent reasonably necessary for support; (b) a payment up to $7,500 on account of personal bodily injury not including pain and suffering or compensation for actual pecuniary loss; and (c) compensation for loss of future earnings to the extent reasonably necessary for support.

N.Y. Debt. & Cred. Law § 282(iii)(3)

*North Carolina:*

### Claims for Negligence and Tortious Conduct

Compensation for personal injury or compensation for the death of a person on whom the debtor was dependent are exempt except from claims for expenses relating to the injury giving rise to the compensation and for child support obligations.

N.C. Gen.Stat. § 1C-1601(a)(1)

*North Dakota:*

### Claims for Negligence or Tortious Conduct

To the extent necessary for support, debtor may exempt a $7,500 payment for the wrongful death of an individual on whom the debtor depended; $7,500 for personal bodily injury not including pain and suffering or compensation for actual pecuniary loss is exempt.

N.D. Cent.Code § 28-22-03.1(4)

*Ohio:*

### Claims for Negligence and Tortious Conduct

A payment to a dependent on account of wrongful death is exempt to the extent necessary for support; up to $5,000 in compensation for personal injury not including pain and suffering or pecuniary loss is exempt; compensation for loss of future earnings is exempt to the extent necessary for support.

Ohio Rev.Code Ann. § 2329.66(A)(12)

*Oklahoma:*

### Claims for Negligence and Tortious Conduct

A claim for personal bodily injury not in excess of $50,000 is exempt, but claims for exemplary or punitive damages are excluded from the exemption.

Okla. Stat. Ann. tit. 31, § 1(A)(21)

*Oregon:*

### Claims for Negligence and Tortious Conduct

Debtor may exempt up to $10;000 on account of personal bodily injury; debtor may also exempt compensation for loss of future earnings to the extent reasonably necessary for support.

Or.Rev.Stat. § 23.160(1)(j)

*South Carolina:*

### Claims for Negligence and Tortious Conduct

A payment for bodily injury to the debtor or wrongful death or bodily injury of an individual the debtor was dependent on is exempt.

S.C.Code Ann. § 15-41-30(11)(B)

*Tennessee:*

### Claims for Negligence and Tortious Conduct

Payments of up to $7,500 on account of personal bodily injury, of up to $10,000

on account of wrongful death and amounts necessary for support on account of loss of future earnings are exempt.

Tenn.Code Ann. § 26–2–111(2)(B)

## Utah:

### Claims for Negligence and Tortious Conduct

Proceeds of insurance, a judgment or a settlement, or other rights accruing as a result of bodily injury to the debtor or the wrongful death or bodily injury to an individual the debtor was dependent on are exempt.

Utah Code Ann. § 788–23–5

## Vermont:

### Claims for Negligence and Tortious Conduct

Compensation for personal bodily injury, pain and suffering or actual pecuniary loss; compensation for the wrongful death of an individual on whom the debtor was dependent.

Vt. Stat. Ann. tit. 12, §§ 2704(19)(F) and (G)

## Virginia:

### Claims for Negligence and Tortious Conduct

Exempt

Va.Code Ann. § 34–28.1

## West Virginia:

### Claims for Negligence and Tortious Conduct

Up to $15,000 on account of bodily injury to the debtor, or compensation in amounts necessary for support of loss of future earnings of the debtor or an individual of whom the debtor is a dependent is exempt.

W. Va.Code § 38–10–4

From our examination of the legislative history of § 3881, we have found no reference to an exemption for personal injury causes of action, settlement proceeds (unless such have taken the form of an annuity), or judgment amounts. From our analysis of the statutory language, within both the context of other Louisiana law (Civil Code Article 2315) and the jurisprudence interpreting the specific provisions of that law, and within the context of exemption laws from other states and as promulgated by Congress, we conclude that the damages relating to loss of future earnings capacity, not being earnings owed by an employer (for any week) for work performed, is more properly described, within the exemption context, as damages for personal injuries caused by the fault of another. Therefore, the earnings exemption, under Louisiana law, is not applicable.

The debtor's argument here is analogous to the "representational" argument in *Coltellaro's* property of the estate analysis. If the proceeds of the lawsuit represent property which would have been exempt, then the proceeds are themselves exempt. It seem to us that the same logic which refuses the representational argument as to estate property also applies here. The exemption is for wages, not lawsuit proceeds representing wages.

Before we quit our discussion of Louisiana law, we must recognize and test our analysis against a Louisiana case that seemingly develops a replacement for exempt property exemption that might be argued to be applicable here.

The debtor in the Louisiana Supreme Court decision, *Thompson–Ritchie & Co. v. Graves, et al.*,[141] insured his homestead and personal property with a $2,000 homeowner's policy. After fire destroyed the house and a portion of the household property, a creditor garnished the insurance proceeds before they could be disbursed to the insured/debtor. The debtor intervened to plead his exemptions.[142]

---

141. 167 La. 1024, 120 So. 634 (1929).

142. *Thompson–Ritchie & Co.*, 167 La. at 1026, 120 So. at 634.

Noting that the issue was *res nova* in Louisiana, the *Thompson–Ritchie & Co.* court looked to the common law for guidance. The court settled upon the common-law majority rule as found in *Corpus Juris:*

> Since the homestead statutes are to be liberally construed to protect a homestead to which the debtor is justly entitled, funds realized from the insurance of exempt premises are themselves exempt, as they do not represent a mere personal contract of indemnity, but the homestead itself, and the money takes the place of the property destroyed.[143]

The reason for this rule, the court points out, is "that the property has been exempted by law for the use of the exemptor and his family, and he may insure it to protect himself and them from loss. It is intended by the insurance to secure the means, in case of loss, for the restoration of the property after its destruction by fire."[144]

In addition to the debtor's right to insure his exemption, the court is concerned with what it terms a "technical" reading of the law:

> Not to allow the insurance money after loss to take the place of the property destroyed, and be exempt from liability to the debts of the exemptor, would, by a mere technical evasion, prevent the object and spirit of the statutes of exemptions, always to be liberally construed in favor of the exemptor. The same rule applies to exempted personal property.[145]

The "technical evasion," we assume, is the reading of the statute to be limited to actual homesteads (bricks, wood, dirt, concrete, etc.) as a way of evading the purpose of the exemption laws. We think *Thompson–Ritchie & Co.* does not threaten our analysis, nor our conclusion. The insurance proceeds were designed, by specific contract, to replace the homestead to the extent of damage. The homestead was exempt.

The earnings exemption, we have determined, does not extend to earning capacity or earnings already paid which have become assets of a different nature. As we have pointed out, the loss of earning capacity cause of action is expressly not to stand as a measure of or replacement for actual loss. It is something different—capacity, potential; not measured by earnings. So, in fact, we do not, in the loss of earnings capacity cause of action, have a replacement for earnings for personal services. We are dealing, analytically, with a cause of action designed to replace an asset, potential, without regard to whether the potential would ever be fulfilled. In fact, we have the personification of our concept in the person of Mr. Ballard. He is still at his same job. He makes (we think) the same money as he made before the accident. Yet, he had (now the estate has) a cause of action for loss of earning capacity. He has (because of § 541(a)(1)) an unfettered claim to the earnings generated by his post-petition performance of personal services because, as of the petition date, he had no vested interest in his job that was cognizable as a legal or equitable interest in property. The representative or replacement theory of *Thompson–Ritchie* is inapplicable to the relationship between the earnings exemption and the loss of earning capacity cause of action.

## SHOULD WE EQUITABLY, OR, OUT OF PRACTICAL CONSIDERATIONS, CARVE OUT A BIT FOR MR. BALLARD?

Finally (and we mean it), we discuss one of the "practical" arguments that we have heard in court and bandied about elsewhere through the years. We need the debtor's help and unless the debtor has

---

143. *Thompson–Ritchie & Co.,* 167 La. at 1027, 120 So. at 635; *citing,* 29 C.J. § 131, p. 838, "Homesteads."

144. *Thompson–Ritchie & Co.,* 167 La. at 1028, 120 So. at 635.

145. Id.

some (monetary) interest, his testimony, cooperation, etc. cannot be insured, at least to its full potential.

We think this a frail excuse for carving out of the bankruptcy estate property to be paid to a debtor. In the first place, a debtor, in the vast majority of cases, has filed the bankruptcy case voluntarily, presumably with the scope of a debtor's duties in view.[146] Among the debtor's duties includes the duty to "cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title," [147] which include the duty "to collect and reduce to money property of the estate for which such trustee serves." [148]

We mentioned that Mr. Ballard has fully cooperated. That is fine, because it was his duty to do so. The suggestion that a debtor should be "primed" (or oiled) before the duties imposed by the bankruptcy court will be performed is ridiculous.[149]

Another thing. Not only is it ridiculous, but such a course of conduct is tantamount to paying a fact witness for fact testimony. Non-expert witness fees, in federal court, are paid according to 28 U.S.C. § 1821 (West 1999).[150] There is no "cooperation

146. If not, too bad. The duties will be imposed.

147. 11 USCA § 521(3).

148. 11 USCA § 704(1).

149. We see as the downside to performing one's duty as a debtor, unless the debtor be so upset as to sabotage the lawsuit, to be only that the debtor has no interest in embellishment, but will merely testify as to the facts.

150. 28 U.S.C. § 1821 (West 1999)

\* \* \*

(b) A witness shall be paid an attendance fee of $40 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance.
(c) (1) A witness who travels by common carrier shall be paid for the actual expenses of travel on the basis of the means of transportation reasonably utilized and the distance necessarily traveled to and from such witness's residence by the shortest practical route in going to and returning from the place of attendance. Such a witness shall utilize a common carrier at the most economical rate reasonably available. A receipt or other evidence of actual cost shall be furnished.
(2) A travel allowance equal to the mileage allowance which the Administrator of General Services has prescribed, pursuant to section 5704 of title 5, for official travel of employees of the Federal Government shall be paid to each witness who travels by privately owned vehicle. Computation of mileage under this paragraph shall be made on the basis of a uniformed table of distances adopted by the Administrator of General Services.
(3) Toll charges for toll roads, bridges, tunnels, and ferries, taxicab fares between places of lodging and carrier terminals, and parking fees (upon presentation of a valid parking receipt), shall be paid in full to a witness incurring such expenses.
(4) All normal travel expenses within and outside the judicial district shall be taxable as costs pursuant to section 1920 of this title.
(d) (1) A subsistence allowance shall be paid to a witness when an overnight stay is required at the place of attendance because such place is so far removed from the residence of such witness as to prohibit return thereto from day to day.
(2) A subsistence allowance for a witness shall be paid in an amount not to exceed the maximum per diem allowance prescribed by the Administrator of General Services, pursuant to section 5702(a) of title 5, for official travel in the area of attendance by employees of the Federal Government.
(3) A subsistence allowance for a witness attending in an area designated by the Administrator of General Services as a high-cost area shall be paid in an amount not to exceed the maximum actual subsistence allowance prescribed by the Administrator, pursuant to section 5702(c)(B) of title 5, for official travel in such area by employees of the Federal Government.
(4) When a witness is detained pursuant to section 3144 of title 18 for want of security for his appearance, he shall be entitled for each day of detention when not in attendance at court, in addition to his subsistence, to the daily attendance fee provided by subsection (b) of this section.

\* \* \*

28 U.S.C. § 1821 (West 1999).

allowance" delineated within the text of this statute. The state law on witness fees in La. R.S. 13:3661(B) [151] does not provide for additional "cooperation compensation." It may be the case that the estate should reimburse debtors such as Mr. Ballard according to the terms of the applicable statute. But because the debtor, like any other person, is required to "tell the truth," and is subject to the subpoena power of the judicial system, and unlike other persons, is under a separate federally-imposed duty to assist the trustee in reducing property to money, additional payment strikes us as, at least, unseemly.

[151.] La. R.S. 13:3661(B) reads:

> B. (1) No witness residing and employed outside of the parish and more than twenty-five miles from the courthouse where the trial or hearing is to be held shall be subpoenaed to attend court personally unless the party who desired the testimony of the witness has deposited with the clerk of court a sum of money sufficient to cover:
> (a) Reimbursement of the traveling expenses of the witness in traveling to the court and returning, at the rate of twenty cents a mile.
> (b) The witness' fee at the rate of twenty-five dollars a day.
> (c) Hotel and meal expenses at the rate of five dollars a day.
> (2) Such a witness shall be paid his expenses and fee immediately by the clerk of court when the witness has answered the subpoena and has appeared for the purpose of testifying.

[152.] § 201. Bribery of public officials and witnesses

> * * *
> (b) Whoever—
> * * *
> directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testi-

Wait. We have thought a second about our last statement. The debtor, as any other fact, is obligated to tell the truth and, as mentioned, must assist the trustee. Why, again, is it necessary to carve out a portion of the estate's property to give to the debtor? We think there can be no other answer than that the interest served by such a payment can be nothing more than more than the truth (we'll call it). We have a problem with this.

Title 18 U.S.C. § 201,[152] makes it a crime—punishable by up to 15 years in prison—for "corruptly" giving anything of value to a witness with the intent to influence that person's testimony. Up to two

> mony, or with intent to influence such person to absent himself therefrom;
> directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity in return for being influenced in testimony under oath or affirmation as a witness upon any such trial, hearing, or other proceeding, or in return for absenting himself therefrom; shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.
> (c) Whoever—
> * * *
> directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;
> directly or indirectly, demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon any such trial, hearing, or other proceeding, or for or because of such person's absence therefrom; shall be fined under this title or imprisoned for not more than two years, or both.
> * * *
> 18 U.S.C. § 201(c)(2)–(3) (West 1999).

years in prison may be received for payments merely "for or because of the testimony" of the fact witness.

The Louisiana version of this statute is La. R.S. 14:118,[153] which would also seemingly apply to the giving of estate property to someone who can be compelled to testify for no other purpose than to "influence his conduct" as a witness "upon a trial or other proceeding before any court. . . ."

■ We recognize that a (transparent) facade could be placed upon such a giving of value, that being the settlement and compromise of the debtor's claim to an interest in the lawsuit. We have nothing else to say about this, as we think it clear that the cause of action is estate property, that arguments and analyses under § 541(a)(6) are plainly wrong, and that the answer to the question of whether the exemption exists under applicable law is, with some work, pretty easy to get to from a litigation standpoint. We should not pass the debtor a slice of the property under the guise of a "compromise" of the debtor's claims.

## CONCLUSION

We are sorry for Mr. Ballard. However, we are compelled to rule that the settlement and compromise is approved in amount but that the entire settlement amount is property of the bankruptcy estate. Further, there is no applicable exemption applicable to any of the proceeds. A separate Order shall be entered. The "note" in *Wischan* is now, on our mind, laid to rest. Long may it lay.

---

153. La. R.S. 14:118(A)(1)(d) and (2) reads:

A. (1) Public bribery is the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any of the following persons, with the intent to influence his conduct in relation to his position, employment, or duty:

\* \* \*

(d) Witness, or person about to be called as a witness, upon a trial or other proceeding before any court, board, or officer authorized to hear evidence or to take testimony.

\* \* \*

(2) The acceptance of, or the offer to accept, directly or indirectly, anything of apparent present or prospective value, under such circumstances, by any of the above named persons, shall also constitute public bribery.